1   **Daniel M. Cislo** (SBN 125378)
      *dan@cislo.com*
2   **Mark D. Nielsen** (SBN 210023)
      *mnielsen@cislo.com*
3   CISLO & THOMAS, LLP
    12100 Wilshire Boulevard, Suite 1700
4   Los Angeles, California 900925
    Telephone: (310) 451-0647

5   **David J. Tappeiner** (SBN 243979)
      *dtappeiner@fmam.com*
6   **Mark A. DePaco** (SBN 200662)
      *mdepaco@fmam.com*
7   FELL, MARKING, ABKIN, MONTGOMERY,
    GRANET & RANEY, LLP
8   222 East Carrillo Street, Suite 400
    Santa Barbara, California 93101
9   Telephone: (805) 963-0755

10  **Attorneys for Plaintiff**
    **STANDUP PADDLE SPORTS, LLC**

11

12

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

16  STANDUP PADDLE SPORTS, LLC        )   Case No.
                                      )
17              Plaintiff,            )   **COMPLAINT AND JURY TRIAL**
                                      )   **DEMAND**
18         vs.                        )
                                      )
19  FOCUS SURFBOARDS, INC. and DOES 1 )
    through 10, inclusive,            )
20                                    )
                Defendants.           )
21                                    )
                                      )
22

23          Plaintiff STANDUP PADDLE SPORTS, LLC ("SPS") as and for its Complaint against

24  Defendants FOCUS SURFBOARDS, INC. ("Focus") and DOES 1 through 10, alleges upon

25  personal knowledge as to its own acts and as to events taking place in its presence, and upon

26  information and belief as to all other facts, as follows:

27  / / /

28  / / /

---

COMPLAINT

1

## NATURE OF THIS ACTION

1.      This is an action for: (i) violation of the Lanham Act (15 U.S.C.A. § 1051 et seq.); (ii) unfair competition (California Business & Professions Code § 17200 et seq.); (iii) false advertising (California Business & Professions Code § 17500 et seq.); (iv) deceit; (v) fraudulent misrepresentation; (vi) negligent misrepresentation; and (vii) breach of contract. Focus has deliberately engaged in acts of false and misleading commercial advertising in connection with Focus' standup paddleboard sales, and has otherwise breached a licensing agreement into which SPS and Focus entered in or about May 24, 2012.

2.      SPS designs, manufactures, and distributes standup paddleboards throughout the world.  Standup paddleboards may be used on various bodies of water, including oceans, lakes, rivers, and canals.

3.      Focus also designs, manufactures, and distributes standup paddleboards throughout the world.  Focus produces standup paddleboards for its own company and is currently the manufacturer and supplier of standup paddleboards for the SUP/surf/skateboard/watersports brand, Body Glove International, LLC ("Body Glove").

4.      On or about May 24, 2012, SPS and Focus entered into a written Licensing Agreement (the "Licensing Agreement") whereby SPS licensed certain trademarks and intellectual property rights in connection with the design, manufacture, advertisement, promotion, distribution, and sale of licensed products to Focus for its use in a territorial area defined as the Eastern part of the United States (defined by the Eastern Standard Time Zone) and markets globally. See **EXHIBIT "1."** This action arises, in part, from Focus' breach of the Licensing Agreement.

5.      On or about June 19-21, 2015, Mo Freitas ("Freitas"), a professional surfer and standup paddle boarder who is sponsored by Focus and, among others, Body Glove, used SPS' "One World" standup paddleboard in the Payette River Games in Cascade, Idaho and won the competition. Stickers bearing the marks of Focus and Body Glove were strategically placed on the standup paddleboard used by Freitas and deliberately over SPS' logos, making the board appear to be designed not by SPS, but either by Focus or Body Glove. See **EXHIBIT "2."** The

Payette River Games competition was broadcast nationally on CBS Sports TV three times and potentially could be one of the most high profile standup paddleboard sport events in the history of the sport.

6.     To maximize the revenue potential of Freitas' victory at the popular Payette River Games, Focus took credit for being the designer of the standup paddleboard used by Freitas, noting:

> Mo went on to prove that this new sport is yet to be totally discovered, first time racing on the rivers with a production board from Focus SUP that had to be shortened, on the spot, with a hacksaw, to the 11′ and under size limit eventually came ahead of boards that were designed specifically for this event. And a great event it was! WorldClass all the way.

See **EXHIBIT "3."**

Focus intentionally misrepresented to the public that the standup paddleboard used by Freitas was a Focus production board even though it was an SPS' design, and no credit was given to SPS. **EXHIBIT "4."**  SPS' "One World" standup paddleboard was used again by Freitas in the SUPCROSS® event that took place in Lake Tahoe, California on or about June 27/28, 2015.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction of this action pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a), 1338(b).

8.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district pursuant to 28 U.S.C § 1391(b).

## PARTIES

10.     Plaintiff SPS is a California limited liability company with its principal place of business in Santa Barbara, California.

11.     Defendant Focus Surfboards, Inc. is a corporation that is incorporated under the laws of the State of California with its principal place of business in Canoga Park, California.

12.     The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to SPS, who therefore sues such defendants by such fictitious names.  Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  SPS will seek leave from the Court to amend this complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

## FACTUAL ALLEGATIONS

A.     **Background on SPS**

13.     SPS is owned by Deb and Warren Thomas ("Deb and Warren").  Deb and Warren also own another, related entity, SurfingSports.com, Inc.  SPS was founded in 2005 and is the first fully dedicated standup paddleboard store in the United States.  Together, Deb and Warren are pioneers in the industry; they helped establish the sport and industry of standup paddling in California.  Deb Thomas became the first female standup paddler in North America in 2005.  Deb and Warren brought the first production standup paddleboards to market.  Deb and Warren have spent considerable time and money establishing their brand and protecting their trademarks and other valuable intellectual property rights. Focus' deliberate actions have resulted in serious detriment to SPS and its business.

14.     In addition to creating custom designs, SPS manufactures and produces a line of paddleboards, paddles, and fins.  Currently, there are seven (7) independent "series" of boards, including the "WD Series," the "Stoke Series," the "Mahalo Series," the "One World Series," the "Hammer Series," the "Jammer SUP," and the "Mallet SUP."  Each series consists of boards of varying specifications and prices.  The "One World Series," for example, consists of paddleboards ranging in size from 11'1" x 30" to 11'11" x 31" and ranging in price from $1,299.00 to $1,849.00 (as of the date of this complaint). See **EXHIBIT "5"**.

15.     The distinguishing characteristics of SPS include a well-recognized brand, distinctive designs, shapes, and products that emphasize quality and craftsmanship within the

watersports board industry, including the United States standup paddleboard market in which SPS competes with Focus and Body Glove.

16.     SPS has extensively advertised and promoted its products utilizing its trademarked logo and its signature designs and shapes.

17.     SPS has taken particularly great care and pride in applying the highest level of professional skill in the research, development, design, and manufacture of SPS products.  SPS has invested hundreds of thousands of dollars over the years in the research, design, manufacturing, marketing, promotion, advertising, and sale of its products.

18.     SPS has established a worldwide reputation for high quality products, including, primarily, standup paddleboards.  SPS products have accordingly acquired outstanding renown and invaluable goodwill in the United States and around the world.

**B.     SPS' Relationship with Focus**

19.     Focus manufactures its own line of standup paddleboards for itself and Body Glove.  Focus also facilitates the manufacture of paddleboards for other watersports companies, including Surf Diva and Pat Rawson Surfboards.  Focus maintains production facilities in Guangdong Province, China.

20.     SPS and Focus entered into a written Licensing Agreement on or about May 24, 2012, whereby SPS licensed its trademarks and intellectual property rights in connection with the design, manufacture, advertisement, promotion, distribution, and sale of licensed products to Focus.  Focus, as a licensee, was granted certain rights to SPS' intellectual property for the purpose of expanding awareness of SPS products in the territory covered by the Licensing Agreement, to wit, the Eastern United States and globally.   One of the main reasons SPS signed the Licensing Agreement was the potential for global distribution of its products.

21.     Relevant provisions of the Licensing Agreement include the following:

The license hereby granted is solely an intellectual property rights license agreement and neither constitutes nor is to be considered a franchise agreement. The license hereby granted does not include the right to grant sub-licenses without STANDUP PADDLE SPORTS, LLC's express prior written consent, any use other than that specified in this Agreement, or any use in combination or in

connection with other products without STANDUP PADDLE SPORTS, LLC's express written consent.

LICENSEE shall not have the right to use the Licensed Rights in any manner that either conflicts or infringes the rights of any third party or weakens or impairs STANDUP PADDLE SPORTS, LLC's interest in the Licensed Rights.

LICENSEE shall make no material changes in any sample after it has been approved without submitting the sample for approval.

LICENSEE agrees to comply with all applicable local, State and Federal labeling laws, and to conduct its activities under this Agreement in a lawful manner at all times.

LICENSEE agrees to uphold and protect the image and reputation of the Licensed Rights.   Accordingly, LICENSEE shall use its best, reasonable efforts to manufacture, promote, advertise, distribute and sell Licensed Products under the Licensed Rights in order to meet the demand for the Licensed Products in the Marketplace.

LICENSEE agrees to consult with STANDUP PADDLE SPORTS, LLC on a regular basis regarding any substantive changes, including but not limited to, all new styles and designs, manufacturing schedules, distribution schedules, and new developments, or other matters which would materially affect the rights, obligations and benefits of either party to this Agreement.

LICENSEE agrees that it must submit to STANDUP PADDLE SPORTS, LLC for prior written approval, any trademark, service mark, or name to be used in connection with the Licensed Rights.   STANDUP PADDLE SPORTS, LLC reserves the right to refuse the use or approval of any such marks or names.  It is expressly agreed that LICENSEE shall not have the right to use the Licensed Rights as a trade name, company name, trade style, domain name, fictitious name or d.b.a., or any portion thereof without STANDUP PADDLE SPORTS, LLC's prior written consent.

LICENSEE shall use the proper trademark and copyright notices in connection with the Licensed Rights and any associated copyrightable works.  Such notices shall be visible and appear in the screen for any screen-printed design, in the neck or waist label, or on any label or tag affixed to the Licensed Products.

LICENSEE shall at all times during the term of this Agreement and thereafter defend, indemnify, and hold STANDUP PADDLE SPORTS, LLC and its officers, directors, agents, and employees, harmless from any and all claims, suits, damages, liabilities, costs and expenses, which arise or occur with respect to LICENSEE'S operation of its business as it relates to this Agreement.

Termination of this Agreement, for any reason, shall neither relieve LICENSEE of any obligations arising under this Agreement prior to termination, nor extinguish any rights of STANDUP PADDLE SPORTS, LLC, including, without limitation, the right to inspect books, records, and facilities of LICENSEE, so as to ensure an expeditious conclusion.

See **EXHIBIT "1."**

22.     A principal responsibility of Focus under the Licensing Agreement was to oversee and maintain quality control in connection with the manufacturing of production paddleboards at the factory located in Guangdong Province, China.   Under the pretense of assuring quality control, Focus requested and received detailed design plans from SPS.   At Focus' request, SPS even authorized Focus to digitally scan its paddleboards to record precise measurements.   Focus then utilized this data for its own financial gain by modeling the design (shape) and appearance (color/construction) of its standup paddleboards on SPS' paddleboards but pricing their paddleboards $200 to $300 less.   See **EXHIBIT "6."**   Focus also overpriced the wholesale cost of SPS fins and listed less than one half of the SPS fins on its pricing sheets.   Such activity by Focus violated provisions within the Licensing Agreement, including Focus' agreement to "uphold and protect the image and reputation of the Licensed Rights [held by SPS]."  See **EXHIBIT "1"** at Paragraph 10(a).

23.     Focus also failed to exercise sufficient quality control over the production process, leading to several claims based on poorly manufactured boards.   The lack of quality control has affected consumers' perception of SPS' business.   See **EXHIBIT "7"** for detail.

24.     In addition to its manufacturing duties under the Licensing Agreement, Focus was responsible to exercise its "Best Efforts" in connection with the promotion and sale of SPS products at tradeshows within the territorial district covered by the Licensing Agreement. Focus was also supposed to respond to inquiries from distributors and prospective customers within the territorial district regarding SPS products.  Focus, however, failed in this regard.  By way of example, Focus failed to fulfill an order of over fifty (50) boards in 2014 to a buyer located in Brigantine, New Jersey, thereby frustrating the buyer and causing him abandon the order.  Focus, moreover, induced SPS into entering the Licensing Agreement by assuring SPS

that it would capitalize on the global demand for standup paddleboards and sell SPS products to markets in Asia, South America, Europe, and the Middle East.

25.     Focus represented that it had a recognized presence in Israel (based on the physical location of one of its principal partners, Tal Merovitz) and that it would work to sell SPS products there.  Focus, however, failed to maintain its end of the bargain.  Further, on numerous occasions, SPS had to ship boards to clients and shops in areas covered by the Licensing Agreement, i.e., Canada, Brazil, and Panama, because Focus lacked an adequate supply of boards through its distribution network.  On other occasions, specific "handshake deals" for the sale of SPS paddleboards within the territory covered by the Licensing Agreement were never consummated by Focus.  One such occasion occurred at the 2012 Surf Expo trade show held in Orlando, Florida, during which Warren struck a tentative deal with the C.E.O. of Typhoon, International, a diving and watersports company based in the U.K., to deliver a large number of SPS paddleboards to Europe via Focus.  Due to Focus' inability to deliver, the deal never came to fruition.

26.     Instead of aggressively marketing SPS products and meeting express demands for SPS products, Focus purposely and deliberately minimized the attractiveness of SPS products to distributors.  Focus created its own products based on SPS paddleboards and priced them below SPS paddleboards, exerted little to no effort to market SPS paddleboards, and, on at least one occasion during the 2014 Surf Expo trade show, physically placed its own paddleboards in locations that attracted more attention, i.e., at the front, and placed SPS paddleboards in locations that received little attention, i.e., at the back.  Focus made SPS products less attractive to its distributors on the East Coast and Canada by fixing SPS' prices higher than the price for the products of Focus and Body Glove, even though the board construction and cost at the factory was identical.

27.     Furthermore, several boards that were warehoused in Los Angeles during the period covered in the Licensing Agreement were sold by Focus with no record of where they went.  Focus did not have authorization to sell the boards to anybody west of the Eastern Time Zone without SPS' permission.  Nine boards, however, were sold by Focus to a marina in Iowa,

which is not in the Eastern Time Zone.  At least one board was sold to a purchaser in Half Moon Bay, California.  Both instances constitute a direct violation of the Licensing Agreement.

28.     In further breach of the Licensing Agreement, Focus caused SPS boards to be produced after the expiration of the Licensing Agreement on December 31, 2014.  In February 2015, Focus accepted an order from its East Coast Distributor, Red Dog Distributing ("RDD") to manufacture SPS boards.  Fifteen (15) SPS boards were manufactured by Focus.  The order was canceled by RDD before the boards were shipped, once it was discovered by RDD that the SPS boards were produced after the expiration of their Licensing Agreement with Focus.  The ultimate disposition of the fifteen (15) boards is unknown after June 24, 2015, when SPS was informed by Focus of their existence.

**C.     Focus' "Reverse Passing Off" and False/Deceptive Advertising**

29.     In June of 2015, professional surfer and standup paddle boarder, Freitas, used SPS' "One World" standup paddleboard in the Payette River Games in Cascade, Idaho.  The Payette River Games consist of a series of events in and around the Payette River, including standup paddling and river surfing.  Freitas won the men's competition in standup paddling.  Prior to the competition, stickers bearing the marks of Focus and Body Glove were strategically placed on Freitas' paddleboard and deliberately over SPS' logos.  As a result, the paddleboard used by Freitas appeared to be designed not by SPS, but either by Focus or Body Glove.  See **EXHIBIT "2."**  The Payette River Games were broadcast nationally on CBS Sports TV and potentially could be one of the most high profile standup paddle sport events in the history of the sport.

30.     Shortly after Freitas' victory at the event, **Focus** issued a press release on its website.  The press release stated:

> Mo went on to prove that this new sport is yet to be totally discovered, first time racing on the rivers with a production board from Focus SUP that had to be shortened, on the spot, with a hacksaw, to the 11′ and under size limit eventually came ahead of boards that were designed specifically for this event. And a great event it was! WorldClass all the way.

See **EXHIBIT "3."**

By issuing the press release, Focus intentionally misrepresented to consumers that the standup paddleboard used by Freitas was a Focus board. In reality, the board used was SPS' design, though no credit was given to SPS.

31.    Following SPS' discovery of the cover-up of its paddleboard, Warren contacted Focus representative Jacob Benzvi by email on June 24, 2015 to inquire as to Focus' motivation in taking such action. See **EXHIBIT "8."** In a response dated July 8, 2015, Mr. Benzvi commented that the words used in the press release that was published on Focus' website were not his, and that the covering up of SPS' logos by large stickers was done by third parties. In particular, Mr. Benzvi wrote "those words [press release] are not mine, we used text from the event, and stickering them up was all done by Mo and Tony on site, I wasn't there." See **EXHIBIT "9."** Even if the obscuring stickers were applied by third parties, Focus did absolutely nothing to correct the situation; but rather, took full advantage of the situation, thus becoming complicit in and/or ratifying the malfeasance allegedly of others.

32.    Despite SPS' communication regarding the incident and the Payette River Games, Focus did not cause Freitas to stop using the SPS' "One World" standup paddleboard with Focus and Body Glove stickers covering SPS' marks or remove the stickers. The same board with the offending stickers and deliberate misrepresentations as to the true designed of the board was used again by Freitas in the SUPCROSS® event that took place in Lake Tahoe, California on or about June 27/28, 2015. See **EXHIBIT "10."** A photograph of Freitas on SPS' "One World" standup paddleboard also remained on Focus's Instagram account in Israel as of the drafting of this complaint. See **EXHIBIT "11."** These facts confirm that Focus' press release regarding the SPS' "One World" standup paddleboard with Focus and Body Glove stickers covering SPS' marks was not a mistake or unintentional, but knowing and intentional.

**D.    The Likelihood of Confusion and Injury Caused by Focus' Actions**

33.    The standup paddleboard industry is growing fast. The sport has been the focus of widespread media attention through Focus' website and others, through print (SUP The Mag, SUP Journal, etc.), television (CBS Sports, etc.), and social media (You Tube, Twitter, Instagram, BG Blog, Sawyer Paddle Blog, Stand Up Zone, Vimeo, etc.). Any consumer seeing

the standup paddleboard with Focus and Body Glove stickers applied thereon would naturally conclude that the board was a Focus model when in fact it was not. In addition, though the Licensing Agreement between SPS and Focus was not extended beyond December 31, 2014, Focus continued (at least through September 2015) to represent to the public at large that SPS was one of its "partners." See **EXHIBIT "12."** These misrepresentations are material and are made in interstate commerce.

34.     Freitas' use of the SPS paddleboard and Focus' statements following Freitas' victory at the Payette River Games have already created confusion in the marketplace. Indeed, in response to a photograph posted to Freitas' account on the social media website, Instagram, in which he is shown to be leaping onto the SPS paddleboard bearing a large Body Glove sticker, one individual commented, "Isn't that a @standuppaddlesports sup shape?!" See **EXHIBIT "13."** Elsewhere, in an online forum regarding the paddleboards used at Payette River Games, one individual commented on June 22, 2015, "Congrats Wardog ! I noticed the deckpad in some shots but he had the Focus logos all over so I wasn't sure. That is very cool. Mo is just an amazing paddler and surfer." See **EXHIBIT "14."**

35.     Consumers who purchase Focus standup paddleboards based upon Focus' endorsement of Freitas' activity at the Payette River Games and the SUPCROSS® are likely to be disappointed by obtaining an inferior product. Focus purchasers will also be confused to the extent they base their purchase off these events because Focus is suggesting that it manufactures, markets, and sells products which are superior to its competitors across product lines when, in fact, the predicate basis for this belief is a complete illusion, i.e., the depicted standup paddleboard is not a Focus product.

36.     Based on the foregoing, Focus has willfully, intentionally, and with knowledge, undertaken a series of actions that violate SPS' rights under the Lanham Act, under unfair competition laws, the Licensing Agreement, as well as under applicable laws regarding fraud, deceit, and misrepresentation.

37.     As a direct and proximate result of Focus' actions, SPS is suffering injury to its business and property as well as a loss of goodwill created by SPS and Deb and Warren in the

United States standup paddleboard market.  SPS seeks treble damages and disgorgement of all Focus' revenue derived from its standup paddleboard sales which were generated from the events surrounding its "passing off" of a SPS board as a Focus product.

38.  Focus is likely to continue to commit the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable harm.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE LANHAM ACT

### (15 U.S.C.A. § 1051 et seq.)

39.  SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

40.  The acts of Focus alleged herein constitute the use of in interstate commerce of a word, term, name, symbol, picture or device, or any combination thereof, or false designation of origin, in connection with the sale, or offering for sale, of goods in violation of Section 43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).  These acts of Focus are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Focus with SPS paddleboards, or as to the origin, sponsorship, or approval of SPS products.

41.  Focus' "reverse passing off" misleadingly causes consumers to believe that the board used by Freitas at the Payette River Games and the SUPCROSS® event in Lake Tahoe, California and referenced on Focus' website is a Focus paddleboard when it is, in fact, a SPS product.  As such, Focus' conduct is likely to cause confusion in the trade and among the general public as to the design, origin, manufacture or sponsorship of the board.

42.  As a direct and proximate result of Focus' actions, SPS has suffered injury.

43.  Such conduct on the part of Focus has caused and will continue to cause irreparable injury to SPS.

/ / /

/ / /

/ / /

**SECOND CAUSE OF ACTION**

**(False Designation of Origin – 15 U.S.C. § 1125(a))**

44. SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

45. Focus misused SPS' intellectual property in its press releases and through its publications, including those made online, in that Focus' excessive and repeated references to Freitas' use of the SPS' "One World" paddleboard is likely to cause confusion, mistake, and/or deception as to an affiliation, connection, or association between Focus and SPS. Focus knew of SPS' adoption and widespread use of the "One World" paddleboard, and knew of the valuable goodwill and reputation acquired by SPS in connection with its standup paddleboard products. Focus nonetheless misused and misappropriated SPS' property by indicating in its press releases and through its publications that the standup paddleboard used by Freitas to win the Payette River Games was from Focus, which it was not and never was, thus causing a false designation of origin under 15 U.S.C. § 1125(a).

46. Upon information and belief, SPS has knowingly, willfully and deliberately, and with conscious disregard for SPS' rights, advertised and sold its products through the use of SPS' "One World" paddleboard design.

47. Focus' advertising and sale of its standup paddleboard products therefore constitute a false designation of the origin of such products in violation of 15 U.S.C. § 1125(a).

48. As a direct and proximate result of the Focus' false designation of origin, SPS has been damaged in an amount that is presently unknown, but believed to be in excess of $75,000.00. At such time as SPS has ascertained its damages to a more specific amount, leave will be sought to amend this complaint to allege such damages, if necessary.

49. By reason of Focus' acts of falsely designating the origin of its goods, SPS has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Focus from any further acts of false designation of origin. Focus' continuing acts of falsely designating the origin of its goods, unless enjoined, will cause irreparable damage to SPS in that it will have no adequate remedy at law to compel Focus to cease such acts. SPS will

1  be compelled to prosecute a multiplicity of actions, one action each time Focus commit such

2  acts, and in each such action it will be extremely difficult to ascertain the amount of

3  compensation which will afford SPS adequate relief.  SPS is therefore entitled to a preliminary

4  injunction and a permanent injunction against further false designation of origin by Focus.

5  ### THIRD CAUSE OF ACTION

6  **(False or Misleading Representation of Fact – 15 U.S.C. § 1125(a))**

7  50.     SPS alleges and incorporates by reference each preceding and succeeding

8  paragraph as though fully set forth at length herein.

9  51.     Focus has represented in its promotions of certain of its products that its products

10  are from or affiliated with SPS.

11  52.     SPS does not supply any products to Focus, and, at present, is in no way

12  affiliated with, connected with, or associated with Focus.

13  53.     Accordingly, Focus has misrepresented the nature, characteristics, qualities, or

14  geographic origin of its goods by insinuating that it is supplied by, or connected with, SPS,

15  which it is not.

16  54.     SPS has been, or is likely to be, damaged by Focus' misrepresentations.

17  55.     Focus' false and/or misleading representations that its products are somehow

18  affiliated with, connected with, or associated with SPS is likely to cause confusion, or to cause

19  mistake, or to deceive as to the affiliation, connection, or association of Focus and SPS.

20  56.     SPS has no control over the composition or quality of the goods provided by

21  Focus.  As a result, SPS' valuable goodwill, developed at great expense and effort by SPS, is

22  being, or is likely to be, harmed by Focus' false and/or misleading statements of fact.

23  57.     The goodwill of SPS' business is of enormous value, and SPS will suffer

24  irreparable harm should Focus' false and/or misleading representations be allowed to continue.

25  58.     Focus acted knowingly and deliberately when it made the misrepresentations; its

26  violation of SPS' rights was willful.

27  59.     As a direct and proximate result of Focus' false and/or misleading statements of

28  fact, SPS has been damaged in an amount that is presently unknown, but believed to be in

excess of $75,000.00.  At such time as SPS has ascertained its damages to a more specific amount, leave will be sought to amend this complaint to allege such damages, if necessary.

60.     Focus' false and/or misleading representations will continue unless enjoined.

## FOURTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAWS

### (California Business & Professions Code § 17200 et seq.)

61.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

62.     California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." (California Business and Professions Code § 17200.)

63.     Focus has engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct described above, including, but not limited to, the following: First, it entered into the Licensing Agreement with SPS whereby SPS licensed certain trademarks and intellectual property rights in connection with the design, manufacture, advertisement, promotion, distribution, and sale of licensed products to Focus for its use in a territorial area defined as the Eastern part of the United States (defined by the Eastern Standard Time Zone) and markets globally.  Second, it beached the Licensing Agreement by, *inter alia*, making SPS products less attractive to its distributors on the East Coast and Canada by fixing SPS' prices higher than the price for the products of Focus and Body Glove, even though the board construction and cost at the factory was identical.  Third, following Freitas' win at the Payette River Games in June of 2015, Focus intentionally misrepresented to the public that the standup paddleboard used by Freitas was a Focus designed board though it was SPS' design, and no credit was given to SPS.  Focus further failed to prevent SPS' "One World" standup paddleboard from being used again by Freitas in the SUPCROSS® event that took place in Lake Tahoe, California on or about June 27/28, 2015.

COMPLAINT

15

64.     In addition to the above, the conduct as alleged throughout the complaint constitutes a violation of False Advertising Laws (California Business & Professions Code § 17500, et seq.), statutory Deceit (California Civil Code § 1710, and fraudulent and negligent misrepresentation that not only result in liability as individual causes of action, they also provide a basis for a finding of liability under California Business and Professions Code § 17200, et seq.

## FIFTH CAUSE OF ACTION

### FALSE ADVERTISING

**(California Business & Professions Code § 17500 et seq. – False Advertising Laws)**

65.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

66.     Focus disseminated advertisements in online formats that contained materially misleading and deceptive information and omitted material information, as discussed throughout the complaint, for purposes of inducing customers to purchase its products, in violation of California Business and Professions Code § 17500 et seq.

67.     SPS has been damaged by said practice and seeks relief as prayed below.

## SIXTH CAUSE OF ACTION

### DECEIT

**(California Civil Code § 1710)**

68.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

69.     Based on Focus' conduct as discussed above, Focus has engaged in fraud and deceit as set forth in California Civil Code § 1710.

70.     SPS has been damaged by said practice and seeks relief as prayed below.

/ / /

/ / /

## SEVENTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

71.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

72.     The misrepresentations, nondisclosure, and/or concealment of material facts made by Focus, as set forth above, were known, or through reasonable care should have been known, by Focus to be false and material and were intended by Focus to be relied upon by consumers.

73.     Consumers were actually mislead and deceived by the misrepresentations, nondisclosure, and/or concealment of material facts made by Focus.

74.     As a result of the conduct of Focus, SPS has been damaged.  In addition to such damages, SPS seeks punitive or exemplary damages pursuant to California Civil Code § 3294 in that Focus engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention of the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

## EIGHTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

75.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

76.     Focus had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the purchase of paddleboards and related products.

77.     Focus specifically and expressly misrepresented material facts to customers, as discussed above.

78.     Focus knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer would be misled by Focus' misleading and deceptive advertisements and statements.

## NINTH CAUSE OF ACTION

### BREACH OF CONTRACT

79.     SPS alleges and incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

80.     SPS brings this action for breach contract under California law, pursuant to the choice of law provision set forth in the Licensing Agreement.

81.     Focus entered into a written contract with SPS in which it agreed, among other things, to: (1) refrain from using the Licensed Rights (as defined in the Licensing Agreement) in any manner that either conflicts or infringes the rights of any third party or weakens or impairs SPS' interest in the Licensed Rights; (2) ensure that all Licensed Products sold…are of the same consistently high quality as products sold by others who are or may hereafter be licensed to sell any products under the Licensed Rights; (3) uphold and protect the image and reputation of the Licensed Rights and to use its best, reasonable efforts to manufacture, promote, advertise, distribute, and sell Licensed Products under the Licensed Rights in order to meet the demand for the products in the marketplace; (4) consult with SPS on a regular basis regarding any substantive changes, including but not limited to, all new styles and designs, manufacturing schedules, distribution schedules, and new developments, or other matters which would materially affect the rights, obligations and benefits of either party to the License Agreement; and (5) in good faith participate in trade shows to the extent and in the manner that SPS shall reasonably direct.

82.     As Focus' conduct described above illustrates, Focus failed to act in accordance with the express provisions of the Licensing Act.  In so doing, Focus put its own profits above complying with the Licensing Agreement.  Additionally, in every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

/ / /

/ / /

83.     Focus breached its express and implied contractual obligations by failing to manufacture, distribute, market, and promote SPS products in good faith in compliance with the Licensing Agreement.

84.     SPS, meanwhile, has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Licensing Agreement.

85.     As a direct and proximate result of Focus' breach of express terms and implied covenants of the contract, SPS has been injured and damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, SPS respectfully requests that this Court:

A.     Enter judgment in favor of SPS against Focus on all Counts and account for and pay over to SPS all of Focus' profits derived from its unlawful conduct, to the full extent provided for by Section 35(a) of the Lanham Act, 15 U.S.C. § 1117, including treble damages;

B.     Enter a permanent injunction restraining and enjoining Focus and their divisions, subsidiaries, officers, agents, employees, attorneys, and all those persons in active concert or participation with them from (i) representing in any advertisement or in connection with any standup paddleboard sale that a SPS product is a Focus product; or (ii) using a SPS shape, mark, design or product in any Focus advertisement.   The injunction should also require Focus to destroy all copies of pictures or any related imagery of the SPS paddleboard that was represented to be a Focus paddleboard as identified in this complaint, including all online videos of the SPS paddleboard;

C.     Enter judgment in favor of SPS against Focus, finding that Focus has committed the foregoing violations willfully, intentionally, and knowingly;

D.     Enter judgment in favor of SPS against Focus finding that this is an exceptional case under the Lanham Act;

1       E.      Award all actual, general, special, incidental, statutory, equitable, punitive, and

2   consequential damages to which SPS is entitled;

3       F.      Award SPS reasonable attorneys' fees and costs;

4       G.      Award pre-judgment and post-judgment interest in the maximum amount

5   allowed under the law; and

6       H.      Award such other and further relief as it deems just and reasonable.

7

8                                              FELL, MARKING ABKIN, MONTGOMERY,
    GRANET & RANEY, LLP

9

10

11  Dated: 10.29, 2015                   By:
                                       Attorneys for Plaintiff

12

13                                **JURY TRIAL DEMAND**

14

15      SPS demands trial jury on all issues so triable.

16                                            FELL, MARKING ABKIN, MONTGOMERY,
    GRANET & RANEY, LLP

17

18

19  Dated: 10.29, 2015                   By:
                                       Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

**EXHIBIT "1"**

**EXHIBIT "1"**

**EXHIBIT "1"**

**EXHIBIT "1"**

**EXHIBIT "1"**

**EXHIBIT "1"**

## LICENSE AGREEMENT

This License Agreement (hereinafter referred to as "Agreement") is effective as of the first day of MAY 24, 2012 by and between STANDUP PADDLE SPORTS, LLC (hereinafter referred to as "STANDUP PADDLE SPORTS, LLC") and FOCUS SURFBOARDS, INC., A California Corporation, having offices at 12114 Sherman Way, North Hollywood, CA 91605. "LICENSEE").

WHEREAS, STANDUP PADDLE SPORTS, LLC has used for many years the trademarks STANDUP PADDLE SPORTS, LLC and has developed certain intellectual property rights in connection therewith, which marks are the subject of U.S. and foreign registrations;

WHEREAS, LICENSEE desires to secure the right and license to use certain trademarks and intellectual property rights in connection with the design, manufacture, advertisement, promotion, distribution and sale of certain Licensed Products as defined hereinafter;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, STANDUP PADDLE SPORTS, LLC and LICENSEE hereby agree as follows:

1. **Definitions**   The following terms shall have the meanings set forth below:
   a. "Marks" shall mean the STANDUP PADDLE SPORTS, LLC and the trademarks, whether alone or in combination, and any other trademarks (if any) as set forth in Schedule A attached hereto and incorporated herein by this reference. The appearance and/or style of the Marks may vary from time to time as specified by STANDUP PADDLE SPORTS, LLC. LICENSEE acknowledges it has no rights to exploit or develop other trademarks used in conjunction with other brands now existing or later developed by and owned or controlled by STANDUP PADDLE SPORTS, LLC. LICENSEE further acknowledges that STANDUP PADDLE SPORTS, LLC have the right to grant licenses to third parties within the Territory for the development and exploitation of these other brands.

   b. "Property" shall mean the intellectual property rights which STANDUP PADDLE SPORTS, LLC deems to be desirable or necessary for LICENSEE to enjoy the fruits of the license granted herein. Such property includes, but is not limited to, certain product styles, designs, samples, patterns, colors, materials, fabrics, titles, trademarks, names, logos, symbols, copyrights, art work, inventions, trade secrets (patentable or unpatentable), patents and pending patent applications.

   c. "Territory" shall mean solely the geographic area specifically set forth and described in Schedule B, attached hereto and incorporated herein by this reference.

   d. "Licensed Products" shall mean solely the products specified in Schedule C, attached hereto and incorporated herein by this reference.

   e. "Licensed Rights" shall mean solely the combination of the Marks and Property.

   f. "Net Sales" shall mean the total of gross dollar amounts invoiced or charged to others by LICENSEE for all Licensed Products sold, distributed, or transferred under the Licensed Rights, reduced by the amount of any bona fide trade quantity discounts and actual returns

only; no deduction shall be made for uncollectible accounts.  No costs incurred in the manufacture, sale, distribution, advertisement or promotion of the Licensed Products or in the payment by LICENSEE of any local, State or Federal taxes of any nature whatsoever shall be deducted from the gross sales amounts or from any royalty payable to STANDUP PADDLE SPORTS, LLC by LICENSEE.  Any sales or transfers of Licensed Products made by LICENSEE to any person or entity that does not deal at arm's length with LICENSEE shall be computed, for the purpose of determining Net Sales, at an amount equal to the price at which LICENSEE would have invoiced or charged purchasers which deal at arm's length with LICENSEE.

g.  "Show Date" shall mean the date by which LICENSEE agrees to have samples of the Licensed Products ready to show to STANDUP PADDLE SPORTS, LLC, which date, for purposes of this Agreement, is set forth in Schedule D attached hereto and incorporated herein by this reference.

h.  "Marketing Date" shall mean the date by which LICENSEE agrees to actually start taking orders from customers for all items defined as Licensed Products, which date, for purposes of this Agreement, is set forth in Schedule E attached hereto and incorporated herein by this reference.

i.  "Shipping Date" shall mean the date by which LICENSEE agrees to begin shipping Licensed Products, which date, for purposes of this Agreement, is set forth in Schedule F attached hereto and incorporated herein by this reference.

j.  "Contract Year" shall be  the periods in which LICENSEE shall be obligated to pay to STANDUP PADDLE SPORTS, LLC royalties, other payments, and minimum royalties, as defined herein – and shall be the same the same as calendar years (as opposed to fiscal years).

2.  **Grant of License and Acknowledgement of Rights**
a.  Subject to the terms and conditions set forth in this Agreement, STANDUP PADDLE SPORTS, LLC hereby grants to LICENSEE, and LICENSEE accepts a exclusive, non-transferable right, license, and privilege to use the Licensed Rights solely on or in connection with the design, manufacture, advertisement, promotion, distribution and sale of Licensed Products within the Territory.

b.  The license hereby granted is solely an intellectual property rights license agreement and neither constitutes nor is to be considered a franchise agreement.  The license hereby granted does not include the right to grant sub-licenses without STANDUP PADDLE SPORTS, LLC's express prior written consent, any use other than that specified in this Agreement, or any use in combination or in connection with other products without STANDUP PADDLE SPORTS, LLC's express written consent.

c.  The parties acknowledge and agree that, due to their respective business backgrounds and prior licensing experience, they do not need the protection of State or Federal Franchise laws.  The parties further agree that State and Federal franchise laws do not and will not apply to this Agreement or to the relationship between LICENSEE and STANDUP PADDLE SPORTS, LLC.

d.  LICENSEE shall not have the right to use the Licensed Rights in any manner that either conflicts or infringes the rights of any third party or weakens or impairs STANDUP PADDLE SPORTS, LLC's interest in the Licensed Rights.  In the event that such should occur, LICENSEE agrees to immediately terminate or modify such use according to STANDUP PADDLE SPORTS, LLC's instructions.  However, the parties agree to arbitrate any dispute arising from a determination made pursuant to this paragraph.

e.  LICENSEE shall not sell or cause to be sold, directly or indirectly, any Licensed Products to any party which the LICENSEE knows, or has reason to know, is likely to resell or distribute such Licensed Products outside of the Territory or to an unsuitable distribution level.

f.  LICENSEE acknowledges and agrees that in order to induce STANDUP PADDLE SPORTS, LLC into this Agreement, as well as to demonstrate its good faith, satisfy the demand for Licensed Products in the Territory, and to further enhance the image and reputation of the Licensed Rights, it shall meet the minimum levels of performance defined in this Agreement and as prescribed in Schedule E.

3.  **Transfer and Ownership of Property**
  a.  LICENSEE acknowledges the value of the goodwill associated with the Licensed Rights and the efforts and considerable sums that STANDUP PADDLE SPORTS, LLC has expended in establishing a worldwide reputation, style, and look for products sold under the Licensed Rights.  Accordingly, LICENSEE agrees that it shall not use the Property in connection with the sale of any products other than Licensed Products and that the Property will be used solely in association with the Marks.

  b.  LICENSEE acknowledges and agrees that any and all goodwill arising from LICENSEE'S use of the Licensed Rights shall inure solely to benefit STANDUP PADDLE SPORTS, LLC, and neither during nor after the termination of this Agreement should LICENSEE assert any claim to such goodwill

4.  **Quality Control and Inspection**
  a.  The parties acknowledge and agree that that the terms and conditions of this Agreement are necessary and reasonable to maintain the reputation of the Licensed Rights and to ensure that all Licensed Products sold hereunder are of the same consistently high quality as products sold by others who are or may hereafter be licensed to sell any products under the Licensed Rights.

  b.  LICENSEE shall provide STANDUP PADDLE SPORTS, LLC with (1) pre-production sample of each Licensed Product that LICENSEE intends to manufacture under the Licensed Rights.  No material changes shall be made to an approved sample after it has been approved by STANDUP PADDLE SPORTS, LLC without resubmitting a sample for approval.  .

  c.  LICENSEE shall make no material changes in any sample after it has been approved without submitting the sample for approval.

d. LICENSEE agrees to comply with STANDUP PADDLE SPORTS, LLC's request for removal of any non-approved products from LICENSEE'S line, showroom, catalogues, etc.

e. LICENSEE agrees to exercise its best efforts to cooperate with STANDUP PADDLE SPORTS, LLC in the coordination of Licensed Products so that the Licensed Products are consistent with the style, image, and quality of other products sold under the Licensed Rights.

f. LICENSEE acknowledges that STANDUP PADDLE SPORTS, LLC shall have the right at any time and without notice to examine and inspect LICENSEE'S facilities during regular business hours to determine compliance with respect to this Agreement.  LICENSEE shall promptly furnish to STANDUP PADDLE SPORTS, LLC, upon STANDUP PADDLE SPORTS, LLC's request from time to time, additional representative production samples of the approved Licensed Product in order to enable STANDUP PADDLE SPORTS, LLC to ascertain whether LICENSEE is in compliance with the provisions of this Agreement

g. Substandard merchandise shall be defined as merchandise not meeting the first quality standards of STANDUP PADDLE SPORTS, LLC.  Sale of said merchandise shall not exceed five percent (5%) of sales per year, and LICENSEE shall destroy all excess substandard merchandise.

h. Distribution Restrictions:  In order to protect and foster the value and reputation of the Licensed Rights:

(i)  LICENSEE agrees to sell Licensed Products to specialty stores, sup shops, surf shops, kayak shops, water sports activity sports etc.  Any sales to any other distribution levels must be approved in writing by STANDUP PADDLE SPORTS, LLC *prior to soliciting interest or orders*.

(ii) STANDUP PADDLE SPORTS, LLC has the right to veto a sale to certain stores and /or outfits that they determine as negative and/or may cause harm to their brand.

(iii)Any sales of Licensed Product to distribution levels other than those specified in (i) above, including, without limitation, warehouse clubs and discount or outlet stores must be approved by STANDUP PADDLE SPORTS, LLC in writing.

i. LICENSEE agrees to comply with all applicable local, State and Federal labeling laws, and to conduct its activities under this Agreement in a lawful manner at all times.

5. **Royalties**       Throughout the term of this Agreement, and for any Option Periods, renewals, or extensions of this Agreement, LICENSEE agrees to pay STANDUP PADDLE SPORTS, LLC a "Royalty" as prescribed in Schedule H.

6. **Payment**
   a. Payments made shall be based upon the greater amount of either (i) the Net Sales of Licensed Products of each month during the Contract or Option Year; or (ii) the corresponding Guaranteed Minimum Royalties. Said payments or any other payments under this Agreement shall be in U.S. dollars and made payable to "STANDUP PADDLE SPORTS, LLC" Payments are due on the fiftieth (50th) day following the end of the month in which the Sale is invoiced.

b. Each payment shall be accompanied by a complete and accurate statement illustrating the calculation of the payment.

c. STANDUP PADDLE SPORTS, LLC's acceptance of any payments made by LICENSEE under this Agreement shall not: (i) prevent STANDUP PADDLE SPORTS, LLC from disputing, at a later date, any amount owed; (ii) prevent STANDUP PADDLE SPORTS, LLC from demanding more information regarding payments finally due; or (iii) constitute a waiver of any breach of this Agreement if any such breach has occurred.

d. Time is of the essence with respect to all payments due to STANDUP PADDLE SPORTS, LLC by LICENSEE. LICENSEE acknowledges and agrees that any manner of payment other than that prescribed in this Agreement shall constitute a material breach of this Agreement and is cause for termination without opportunity to cure.

7. **Books and Records**
   a. LICENSEE shall keep during the Term of this Agreement and for at least one (1) years after the termination of this Agreement, accurate books of account and records covering all transactions relating to the Licensed Products, including but not limited to all Licensed Products manufactured, distributed and sold under the Licensed Rights. STANDUP PADDLE SPORTS, LLC and its authorized representatives shall have the right during regular business hours or upon request to examine and copy such books of account, records, or documents in possession or under the control of LICENSEE relating to the Licensed Products or this Agreement.

   b. Such records and accounts shall be maintained in accordance with generally accepted accounting procedures and principles, and STANDUP PADDLE SPORTS, LLC shall have the right to examine, inspect and audit such records at STANDUP PADDLE SPORTS, LLC's expense.

8. **Advertising, Promotion and Marketing**
   a. In order to maintain the image and reputation of the Licensed Rights, LICENSEE agrees to abide by the policies and procedures established by STANDUP PADDLE SPORTS, LLC regarding, without limitation, trademark usage, trademark notices, advertising, promotions activities and media relations. LICENSEE further agrees that it shall not engage, participate, or promote activity that diminishes and/or tarnishes the image and/or reputation of Licensed Rights. STANDUP PADDLE SPORTS, LLC shall have the right to approve or disapprove the sales, marketing, or promoting forces used by LICENSEE to sell and advance the Licensed Products.

   b. LICENSEE shall in good faith participate in trade shows to the extent and in the manner that STANDUP PADDLE SPORTS, LLC shall reasonably direct.
   c. STANDUP PADDLE SPORTS, LLC will continue to develop its brand and market its brand locally and internationally to maintain the brand name and increase brand recognition.
   d. Marketing effort by STANDUP PADDLE SPORTS, LLC will be but not limited to:
      (i)   tradeshow appearances at OR and SURF EXPO

      (ii)     demo days with dealers
      (iii)    internet marketing
      (iv)    contest entrees
      (v)     team rider program

e. all travel expenses related to the above and contest entries will be at STANDUP PADDLE SPORTS, LLC own expenses

f. team rider program will be developed together with LICENSEE

9. **Consultation** - LICENSEE agrees to consult with STANDUP PADDLE SPORTS, LLC on a regular basis regarding any substantive changes, including but not limited to, all new styles and designs, manufacturing schedules, distribution schedules, and new developments, or other matters which would materially affect the rights, obligations and benefits of either party to this Agreement.  STANDUP PADDLE SPORTS, LLC agrees to assist LICENSEE with reasonable support from its art, marketing, and video departments for development of new products, advertising and marketing plans, events, etc.

10. **Best Efforts**

a. LICENSEE agrees to uphold and protect the image and reputation of the Licensed Rights. Accordingly, LICENSEE shall use its best, reasonable efforts to manufacture, promote, advertise, distribute and sell Licensed Products under the Licensed Rights in order to meet the demand for the Licensed Products in the Marketplace.

b. LICENSEE agrees that it will sell and distribute the Licensed Products solely in the Territory set forth in this Agreement.  LICENSEE shall sell and distribute the Licensed Products to merchants who sell and distribute directly to the public and to wholesalers and distributors who sell and distribute to retail stores.

c. LICENSEE agrees that it shall manufacture and ship all approved, confirmed orders for the Licensed Products upon receipt of such order, by the delivery date specified, or within a reasonable time of receipt of such order.  LICENSEE further agrees not to refuse, withdraw, or withhold approval of Licensed Products from customers with credit approval, without first giving written notice to STANDUP PADDLE SPORTS, LLC.

d. LICENSEE agrees to manufacture and ship at least eighty percent (80%) of approved, confirmed orders during the course of any Contract Year.

11. **Use and Display of the Marks**

a. LICENSEE agrees and acknowledges that the presentation and image of the Licensed Products should be uniform and consistent with all products bearing the Licensed Rights. Accordingly, LICENSEE agrees to use only those labels bearing the Licensed Rights which are provided by or approved in writing by STANDUP PADDLE SPORTS, LLC. LICENSEE further agrees to permanently affix to any Licensed Products it manufactures, distributes, and/or sells such labels bearing the Licensed Rights and the required legal notices.  Any other form of identification bearing the Licensed Rights including, but not limited to, tags, signs, stationary and order forms, must be approved by STANDUP PADDLE SPORTS, LLC in writing prior to its use.

b. LICENSEE agrees that it must submit to STANDUP PADDLE SPORTS, LLC for prior written approval, any trademark, service mark, or name to be used in connection with the

Licensed Rights. STANDUP PADDLE SPORTS, LLC reserves the right to refuse the use or approval of any such marks or names. **It is expressly agreed that LICENSEE shall not have the right to use the Licensed Rights as a trade name, company name, trade style, domain name, fictitious name or d.b.a., or any portion thereof without STANDUP PADDLE SPORTS, LLC's prior written consent.**

c. All Licensed Products manufactured, distributed or sold by LICENSEE shall expressly state that the Licensed Rights are owned by STANDUP PADDLE SPORTS, LLC.

d. LICENSEE shall use the proper trademark and copyright notices in connection with the Licensed Rights and any associated copyrightable works. Such notices shall be visible and appear in the screen for any screen-printed design, in the neck or waist label, or on any label or tag affixed to the Licensed Products.

12. **Ownership of the Licensed Rights**
   a. LICENSEE acknowledges and agrees that: (i) the Licensed Rights are owned solely and exclusively by STANDUP PADDLE SPORTS, LLC; and (ii) all rights in any trademarks, included in, based on or derived from the Licensed Products, including goodwill, are reserved to STANDUP PADDLE SPORTS, LLC. LICENSEE shall not acquire any further rights or interest of any nature in the trademarks or goodwill as a result of LICENSEE'S use thereof and all use of the Licensed Rights shall inure solely to the benefit of STANDUP PADDLE SPORTS, LLC.

   b. LICENSEE agrees that any unauthorized use of the Licensed Rights as a trade name, service mark, business name, trade style, fictitious business name or d.b.a. shall also inure to the benefit of STANDUP PADDLE SPORTS, LLC, and that any such use by LICENSEE shall not give to LICENSEE any right, title or interest in the Licensed Rights.

   c. LICENSEE acknowledges the validity of STANDUP PADDLE SPORTS, LLC's ownership of the Licensed Rights and agrees that it has not and will not during the term of this Agreement or anytime thereafter, anywhere in the world: (i) attack the title or any rights of STANDUP PADDLE SPORTS, LLC in the Licensed Rights or attack the validity of this Agreement, or do anything either by an act of omission or commission which might impair, jeopardize, violate or infringe any of the License Rights; (ii) claim adversely to STANDUP PADDLE SPORTS, LLC or anyone claiming through STANDUP PADDLE SPORTS, LLC any right, title or interest in the Licensed Rights; (iii) misuse or harm or bring into disrepute the Licensed Rights; or (iv) register or apply for registration of any of the Licensed Rights, trademark, or service mark, which is in STANDUP PADDLE SPORTS, LLC's opinion, the same or confusingly similar to any of the Licensed Rights, trademarks, or service marks of STANDUP PADDLE SPORTS, LLC.

   d. LICENSEE agrees that if it at anytime obtains any such right, title, or interest in the Licensed Rights without the STANDUP PADDLE SPORTS, LLC's prior knowledge or prior consent, LICENSEE has acted or will act as an agent for the benefit of STANDUP PADDLE SPORTS, LLC for the limited purpose of obtaining and assigning such registration to STANDUP PADDLE SPORTS, LLC.

13. **Non-transferability of Rights**    LICENSEE acknowledges and agrees that STANDUP PADDLE SPORTS, LLC may not assign this Agreement without LICENSEE'S consent or approval.  However, LICENSEE agrees that it shall not grant, assign, sub-license or otherwise convey or transfer any rights inuring to the LICENSEE or any obligation or duties owed by LICENSEE to STANDUP PADDLE SPORTS, LLC without prior written consent of STANDUP PADDLE SPORTS, LLC and any attempted transfer or assignment shall be null and void.

14. **Relationship of the Parties** - Subject to Paragraph 12.d, LICENSEE acknowledges and agrees that: (i) it shall be an independent contractor throughout this Agreement; (ii) nothing in this Agreement shall create, be deemed to create, or be construed as creating any partnership, joint venture, employer-employee, or agency relationship; (iii) LICENSEE shall not act as an agent or representative of STANDUP PADDLE SPORTS, LLC in any dealings which LICENSEE may have with any third party; (iv) LICENSEE shall incur no obligation in the name of STANDUP PADDLE SPORTS, LLC without the prior written consent of STANDUP PADDLE SPORTS, LLC.

15. **Insurance and Indemnification**
    a. LICENSEE shall, at its own expense, obtain and maintain throughout the term of this Agreement (i) product liability insurance; (ii) completed operations insurance; and (iii) any other such policies of insurance insuring against risks customarily insured under comprehensive general liability policies.  Combined limits of such policies shall not be less than Two Million Dollars ($2,000,000).  In no event shall LICENSEE manufacture, offer for sale, sell, advertise, promote, ship, and/or distribute the Licensed Products prior to obtaining such insurance policies.  Such policies of insurance shall be endorsed to specifically name STANDUP PADDLE SPORTS, LLC as an additional insured and to provide that the policy cannot be changed, modified or cancelled without at least thirty (30) days' written notice to STANDUP PADDLE SPORTS, LLC.

    b. LICENSEE shall furnish to STANDUP PADDLE SPORTS, LLC within thirty (30) days of the effective date of this Agreement and upon request from time to time a Certificate of Insurance evidencing that such policies are in effect.

    c. Indemnification by LICENSEE:  LICENSEE shall at all times during the term of this Agreement and thereafter defend, indemnify, and hold STANDUP PADDLE SPORTS, LLC and its officers, directors, agents, and employees, harmless from any and all claims, suits, damages, liabilities, costs and expenses, which arise or occur with respect to LICENSEE'S operation of its business as it relates to this Agreement.  Such indemnity shall extend to all Licensed Products, notwithstanding STANDUP PADDLE SPORTS, LLC's prior approval of samples.  Said indemnification shall include, but not be limited to, court costs and reasonable attorneys' fees, and STANDUP PADDLE SPORTS, LLC shall have the right to defend any action or proceeding with the attorney of its own selection, subject to the approval of LICENSEE, with such approval not to be unreasonably withheld.

    d. Indemnification by LICENSOR: LICENSOR shall at all times during the term of this Agreement and thereafter defend, indemnify, and hold LICENSEE and its officers, directors, agents, and employees, harmless from any and all claims, suits, damages, liabilities, costs and expenses, which arise or occur with respect to LICENSOR'S

operation of its business as it relates to this Agreement, including claims that the Marks infringe upon the intellectual property rights of any other person.  Said indemnification shall include, but not be limited to, court costs and reasonable attorneys' fees, and LICENSEE shall have the right to defend any action or proceeding with the attorney of its own selection, subject to the approval of LICENSOR, with such approval not to be unreasonably withheld.

16. **Breach and Cure**
   a. Except where the notice requirement is specifically waived, and except as otherwise specifically set forth in this Agreement, in the event of any breach of this Agreement, the party alleging such breach shall provide the breaching party with a written notification which shall specify a reasonable period of time (not to exceed 30 days) within which the breach is to be cured.

   b. For breach of payments due under Paragraph 6, LICENSEE is allowed five (5) days to cure.  If after five (5) days' notice, the breach has not been cured, STANDUP PADDLE SPORTS, LLC may terminate this Agreement upon written notice to the breaching party, the termination of which shall be effective upon LICENSEE'S receipt of the written notice.

17. **Duration and Termination**
   a. The duration of this agreement shall be two (2) years (NOTE: year one (1) is a long year beginning at the contract signing and ending December 31, 2013) beginning May 24th, 2012, and terminating December 31, 2014.  Thereafter, so long as LICENSEE is not in default, it may notify STANDUP PADDLE SPORTS, LLC in writing between April 1, 2014 and June 30, 2014 that it would like to extend the duration of the Agreement for a five (5) year Option Period ending on December 31, 2019. The parties must agree on minimums no later than June 30, 2014, or this Agreement will terminate naturally on December 31, 2014.   This does not affect the ability of either party to terminate the agreement for cause.

   b. Termination of this Agreement, for any reason, shall neither relieve LICENSEE of any obligations arising under this Agreement prior to termination, nor extinguish any rights of STANDUP PADDLE SPORTS, LLC, including, without limitation, the right to inspect books, records, and facilities of LICENSEE, so as to ensure an expeditious conclusion.

   c. Without prejudice to any other right or remedy available to the STANDUP PADDLE SPORTS, LLC, this Agreement may be terminated at any time upon written notice of such termination to LICENSEE (i) if LICENSEE commits a material breach of this Agreement, which breach has continued uncured according to Paragraph 16; or (ii) if LICENSEE shall make any assignment for the benefit of its creditors, file a petition in bankruptcy, is adjudged bankrupt, becomes insolvent, is placed in the hands of a receiver, or if the equivalent of any proceedings or acts occurs.

   d. Immediately upon termination, LICENSEE shall:
      (i) Cease all use of the Licensed Rights, including but not limited to manufacture, sale, and distribution of the Licensed Products except in accordance with this paragraph;

(ii) Delete any and all references to the Licensed Rights from any advertising, promotional, or directory materials, including any reference to having been a former LICENSEE of STANDUP PADDLE SPORTS, LLC under the Licensed Rights;

(iii) Deliver all materials and property bearing the Licensed Rights (other than actual Licensed Products) including, but not limited to, packaging, labels, and tags, for destruction or disposal by STANDUP PADDLE SPORTS, LLC; and

(iv) Within seven (7) days after termination, deliver to STANDUP PADDLE SPORTS, LLC a final and complete statement certifying the number and description of Licensed Products manufactured or in process of manufacture, including the wholesale price of such Licensed Products and pending orders.

e.  Right of Disposal: STANDUP PADDLE SPORTS, LLC shall have the option to purchase any portion of the inventory of Licensed Products at fifty-percent (50%) of the wholesale price.  Should STANDUP PADDLE SPORTS, LLC elect not to exercise said option, LICENSEE may sell the Licensed Products from its remaining inventory for a period of one hundred eighty (180) days from date of termination, according to the terms of this Agreement.  After expiration of one hundred eighty (180) day period, LICENSEE shall immediately and completely remove the Licensed Rights from any existing products.

f.  Within 180 days prior to the termination of this Agreement, LICENSEE agrees that STANDUP PADDLE SPORTS, LLC shall have the right to negotiate for and conclude a licensing agreement with a third party for the Licensed Products.  STANDUP PADDLE SPORTS, LLC and LICENSEE acknowledge that the new licensee shall have the right to attend tradeshows, advertise, market and manufacture the licensed products, provided that the new licensee shall not ship and/or distribute its Licensed Products prior to the termination of this Agreement.  In the event that this Agreement is terminated for cause, material breach, and late payments, this paragraph shall not apply and STANDUP PADDLE SPORTS, LLC shall have the right to conclude a licensing agreement with a third party without any restrictions.

18.  **Remedies** - LICENSEE acknowledges and agrees that if it should breach or threaten to breach any provision of this Agreement, the remedies at law available to STANDUP PADDLE SPORTS, LLC will be inadequate.  Accordingly, in addition to its remedies at law, STANDUP PADDLE SPORTS, LLC shall be entitled to appropriate injunctive and other equitable relief, without the necessity of STANDUP PADDLE SPORTS, LLC having to post a bond or prove damages.  Such equitable relief includes, but is not limited to temporary restraining order, preliminary injunction, permanent injunction and other alternative relief as may be appropriate.

19.  **Legal Actions**

a.  LICENSEE shall promptly notify STANDUP PADDLE SPORTS, LLC of any infringements, claims, or actions by others in derogation of the Licensed Rights. STANDUP PADDLE SPORTS, LLC shall have the sole right to determine whether any action shall be taken on account of such infringement, claim or actions, and LICENSEE shall have the right to take action only if it obtains the prior written consent of STANDUP PADDLE SPORTS, LLC.  Should STANDUP PADDLE SPORTS, LLC grant such right to LICENSEE to take action of any such infringement, claim or action,

LICENSEE and STANDUP PADDLE SPORTS, LLC agrees to bear the costs and expenses incurred from the legal proceeding.

b. Should STANDUP PADDLE SPORTS, LLC elect to initiate any legal proceedings on account of any infringements, claims or actions by others, LICENSEE agrees to cooperate with and assist STANDUP PADDLE SPORTS, LLC to the extent reasonably necessary to protect and defend the Licensed Rights, which includes, without limitation, being joined as a necessary or desirable party to such proceeding.

c. Should STANDUP PADDLE SPORTS, LLC determine that it is not in the best interest of STANDUP PADDLE SPORTS, LLC and LICENSEE to initiate any legal proceedings, or in the event STANDUP PADDLE SPORTS, LLC settles or resolves any such proceedings, LICENSEE shall have no claim against STANDUP PADDLE SPORTS, LLC for damages and shall have no affect on the validity or enforceability of this Agreement.

20. **Notices** - All notices, approvals, consents, requests, demands or other communication required or permitted to be given under this Agreement shall be in writing, by certified mail, return receipt request, facsimile transmission, electronic mail, or by other means where receipt is acknowledged, and shall be effective on the date of its receipt. However, if such communication is undeliverable, or if receipt is not acknowledged, such communication shall be effective on the date mailed or sent. Such communication shall be directed by one party to the other at its respective address as set forth above, or at any other address that shall be specified in writing.

21. **Governing Law and Resolution of Disputes**
a. The parties agree that this Agreement is executed and delivered in the State of California and shall be construed in accordance with the laws of the State of California, U.S.A. STANDUP PADDLE SPORTS, LLC and LICENSEE agree that any legal action necessary to enforce or interpret the terms of this Agreement shall be brought in the Los Angeles Superior Court or in the U.S. District Court for the Central District of California, and the parties hereby submit to the jurisdiction of said courts.

b. LICENSEE agrees that STANDUP PADDLE SPORTS, LLC may at its sole discretion, elect to have this Agreement construed in accordance with the laws and regulations of the Territory, and/or may elect to have such disputes arising in connection with this Agreement settled under the American Arbitration Association.

c. In the event of a legal action or proceeding, the prevailing party shall be entitled, in addition to its court costs or arbitration fees, to reasonable attorney's fees as shall be determined by the court or arbitrator.

22. **Binding Effect** - This Agreement shall be binding on the parties, their affiliated companies, successors and assigns (if any), and they each warrant that the undersigned are authorized to execute this Agreement on behalf of their respective parties.

23. **Manufacture by Third Party** - LICENSEE agrees that any third party, including, but not limited to, manufacturers, and subcontractors, shall operate their facilities in a manner that

complies with all applicable labor and business codes for the country where the goods are manufactured.

24. **Covenant Not to Compete** - LICENSEE agrees not to sell within the Territory goods competing with Licensed Products without STANDUP PADDLE SPORTS, LLC's prior written consent. Focus and other licensed brand products and private label products listed in Schedule H are approved.

25. **General Provisions**
    a. No waiver or modification of any of the terms or provisions of this Agreement shall be valid unless contained in a single written document signed by both parties. No course of conduct or prior dealings between the parties shall act as a waiver of any provision of this Agreement.

    b. This Agreement, including the Schedules attached, constitutes and contains the entire understanding of the parties, and there are no representations, warranties, promises or undertakings other than those contained in this Agreement. This Agreement supersedes and cancels all previous agreements between the parties.

    c. This Agreement and any information relating to this Agreement, including but not limited to, its terms, conditions and provisions, and the trade secrets, confidential information and property of STANDUP PADDLE SPORTS, LLC, are confidential information and shall not be disclosed without prior written consent of STANDUP PADDLE SPORTS, LLC.

    d. The headings of the articles, paragraphs and subsections of this Agreement have been added for convenience of the parties and shall not affect the construction or provisions of its provisions.

    e. If a provision of this Agreement should be held void, null or unenforceable, such provision will be severed from this Agreement, leaving valid the remainder of this Agreement as is necessary to carry out the intent of the parties and other provisions of this Agreement. Certain provisions of this Agreement, including, without limitation, Paragraphs 4, 9, 14, 17, 19 and 20, shall survive the expiration and termination of this Agreement and shall continue in full force and effect.

    f. Notwithstanding any other provision of this Agreement, LICENSEE expressly agrees and acknowledges that STANDUP PADDLE SPORTS, LLC shall have and retain the unrestricted right to ship any and all products of any sort, including Licensed Products, to any retail outlet in the Territory that is directly owned, operated or controlled by STANDUP PADDLE SPORTS, LLC. This includes online sales to consumers. LICENSEE further agrees and acknowledges that STANDUP PADDLE SPORTS, LLC shall have the unrestricted right to own and operate retail outlets within the Territory, and to advertise and promote the same.

g. The parties agree to execute promptly any documents necessary to effectuate the purpose and intent of this Agreement. The parties represent and warrant that they have made no agreements that are inconsistent with this Agreement or that would otherwise prevent them from entering into this Agreement. The parties further represent and warrant that entering into this Agreement does not does not violate any agreements, rights or obligations existing between them and any other entity.

IN WITNESS WHEREOF, the parties agree that this Agreement shall take effect as of the date first written above.

STANDUP PADDLE SPORTS, LLC

Dated: _5/23/2012_

By: _[signature]_

Warren Thomas
President / CEO

FOCUS SURFBOARDS, INC

Dated: _5/21/12_

By: _[signature]_

Jacob Benzvi
President

Page 13 of 14

## SCHEDULES

A:    **Marks**:  STANDUP PADDLE SPORTS, LLC

B.    **Territory**:  The eastern part of the United States of America (defined by Eastern Time zone EST) and International markets worldwide globally.

C.    **Licensed Products**:  Stand up paddleboards, paddles, leashes, SUP board bags and companion and related items as approved.

D:    **Show Date:**          June 1st, 2012

E:    **Marketing Date:**    July 1st, 2012

F:    **Shipping Date:**      September 1st, 2012

G:    **Effective Date:**     May 24th, 2012

H:    **Royalty Rate Chart**

-------------------Royalty Rate----------------------
Year                         STANDUP PADDLE SPORTS, LLC products
(6/1/2012 to 12/31/2013)
(1/1/2013 to 12/31/2014)

100 SUP boards min per year

| International markets |
|---|
| $50 for first 50 SUPS |
| $75 for 51 up to 100 SUPS |
| $100 for 101 up to 300 SUPS |
| Revisit above 300 SUPS |
| $150 fee per carbon board (Israel) |
| **USA market** |
| $100 for first 200 SUPS |
| $125 for above 201 SUPS |
| Revisit above 300 SUPS |
| Carbon board SUPS exclusive and excluded currently |
| **Accessories fee** |
| 15% of wholesale prices |

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "2"**

**EXHIBIT "3"**

**EXHIBIT "3"**

**EXHIBIT "3"**

**EXHIBIT "3"**

**EXHIBIT "3"**

**EXHIBIT "3"**

**EXHIBIT "3"**



Episode number: 142
Airdate: Saturday, July 11th, 2015
Network: CBS SPORTS NETWORK
Special Airtime: 12:00 pm

Mo Freitas WINS the 2015 Payette River Games! In a truly extraordinary performance, (i/monosurf's took out both the SUPer G and SUP Cross events to make it a clean sweep of the weekend, cementing his position as one of the world's best all round paddlers (and earning $10,000 cash in the process).

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "4"**

**EXHIBIT "5"**

**EXHIBIT "5"**

**EXHIBIT "5"**

**EXHIBIT "5"**

**EXHIBIT "5"**

**EXHIBIT "5"**

**EXHIBIT "5"**



70   DEEP SURF MAGAZINE

Boards Archives - SUP Sports                    http://supsports.com/product-category/stand-up-paddle-boards/

P: 888.805.9978 (TEL:888.805.9978) | 805.962.7877 (TEL:805.962.7877) | 121 SANTA BARBARA ST  SANTA
BARBARA, CA 93101 | VIEW MAP | CONTACT (HTTP://SUPSPORTS.COM/CONTACT-US/) | OPEN DAILY 10-5 PST





(http://www.facebook.com

(https://www.twitter.com

/SUPSports/user/SanRunpaddleboard)



# (HTTP://SUPSPORTS.COM/)



🏠 (HTTP://SUPSPORTS.COM)  ›  THE SHOP
(HTTP://SUPSPORTS.COM/SHOP/)  ›  BOARDS

Default sorting                                                    Showing all 7 results



(http://supsports.com
/shop/stand-up-paddle-boards
/custom-california-series/)

## California Series Custom
SUP
(http://supsports.com
/shop/stand-up-paddle-
boards/custom-california-
series/)



(http://supsports.com
/shop/stand-up-paddle-boards
/hammer-series/)

## Hammer Series
(http://supsports.com
/shop/stand-up-paddle-
boards/hammer-series/)

$1,799.00



(http://supsports.com
/shop/stand-up-paddle-boards
/hammer-soft-top-sup/)

## Hammer Soft Top SUP (http://supsports.com /shop/stand-up-paddle-boards/hammer-soft-top-sup/)

$999.00



(http://supsports.com
/shop/stand-up-paddle-boards
/mahalo-series/)

## Mahalo Series (http://supsports.com /shop/stand-up-paddle-boards/mahalo-series/)

$1,299.00–$1,799.00



(http://supsports.com
/shop/stand-up-paddle-boards
/one-world-series/)

## One World Series (http://supsports.com /shop/stand-up-paddle- boards/one-world- series/)

$1,299.00–$1,849.00



(http://supsports.com
/shop/stand-up-paddle-boards
/stoke-series/)

## Stoke Series (http://supsports.com /shop/stand-up-paddle- boards/stoke-series/)

$1,299.00–$1,799.00



(http://supsports.com
/shop/stand-up-paddle-boards
/wd-series/)

## WD Series (http://supsports.com /shop/stand-up-paddle- boards/wd-series/)

$1,299.00–$1,799.00

YELP REVIEWS (HTTP://SUPSPORTS.COM/STOKED/YELP-REVIEWS/)
MARCH 5, 2015

STOKED FOR LIFE ® CLIENTS (HTTP://SUPSPORTS.COM/STOKED

/STOKED-LIFE-CLIENTS/) NOVEMBER 30, 2014

WD SPRING DAY SHREDDING (HTTP://SUPSPORTS.COM/WD-STOKED
/WD-SPRING-DAY-SHREDDING/) AUGUST 31, 2014



(/stoked)

Boards Archives - SUP Sports                                       http://supsports.com/product-category/stand-up-paddle-boards/



(/shop)

> ## SUP SHOP (/shop)

Boards

Existing Dealers (/dealer-info)

## Become a Dealer (/dealer-application)

P: 888.805.9978 (TEL:888.805.9978) | 805.962.7877 (TEL:805.962.7877) | 121 SANTA BARBARA ST.
SANTA BARBARA, CA 93101 | VIEW MAP | CONTACT (HTTP://SUPSPORTS.COM/CONTACT-US/)

© 2005 - 2015 SUPSPORTS ® | STANDUP PADDLE SPORTS ® | ALL RIGHTS AND LEFTS RESERVED



(https://www.facebook.com/SUPsports)   (https://twitter.com/SUPsports)

(https://plus.google.com/108841526125413125888/posts)

(https://www.youtube.com/user/SUPsport?feature=watch)

(http://instagram.com/standuppaddlesports/)

(http://www.pinterest.com/supsports/)

(http://blog.surfingsports.com/feed/atom)

HOME (HTTP://SUPSPORTS.COM/)     BOARDS (HTTP://SUPSPORTS.COM/BOARDS/)

PADDLES (/SUP-PADDLES)

SCHWAG (HTTP://SUPSPORTS.COM/PRODUCT-CATEGORY/SUP-SCHWAG/)

SUP FINS (HTTP://SUPSPORTS.COM/SUP-FINS/)     BLOG (HTTP://BLOG.SURFINGSPORTS.COM)

STOKED (HTTP://SUPSPORTS.COM/STOKED-FOR-LIFE/)

SUP LESSONS & SUP RENTALS (HTTP://SUPSPORTS.COM/SUP-LESSONS-SUP-RENTALS/)

INFO (HTTP://SUPSPORTS.COM/POLICIES/)

**EXHIBIT "6"**

**EXHIBIT "6"**

**EXHIBIT "6"**

**EXHIBIT "6"**

**EXHIBIT "1"**

**EXHIBIT "6"**

**EXHIBIT "6"**

**Stand Up Paddle Sports**
Santa Barbara, CA

Prices are FOB VA Port

*Stoked For Life ™*

| MODEL | SKU | FOB VA PORT | DEALER | List (almost without the TAX) |
|---|---|---|---|---|
| 11'11" x 31 ONE WORLD 1PB | WOOW11111 | $743 | $855 | $87 |
| 11'11" x 31 ONE WORLD 2PB | WOOW11112 | $797 | $915 | $93 |
| 11'11" x 31 ONE WORLD 1PA | WOOW11111A | $743 | $855 | $87 |
| 11'11" x 31 ONE WORLD 2PA | WOOW11112A | $797 | $915 | $93 |
| 11'11" x 31 ONE WORLD CARBON | WOOW11111CW | $960 | $1,135 | $150 |
| 11'11" ONE WORLD 32" 1PB | WOOW11111P | $728 | $855 | $102 |
| 11'11" ONE WORLD 32" 2PB | WOOW11112P | $728 | $905 | $99 |
| 11'11" ONE WORLD 32" 1PA | WOOW11111PA | $728 | $855 | $102 |
| 11'11" ONE WORLD 32" 2PA | WOOW11112P | $781 | $905 | $99 |
| 11'11" ONE WORLD 32" CARBON | WOOW11111CW | $1025 | $1100 | $50 |



*Stoked For Life ™*
**2014 Stand Up Paddle Sports Price List**

| STAND UP PADDLEBOARDS | | | |
|---|---|---|---|
| SUP MODEL ▾ | SKU | DEALER | MSRP |
| 11'11" x 31" One World Surfski 1PB | WOOW11111PB | $855.00 | $1,490.00 |
| 11'11" x 31" One World Surfski 2PB | WOOW11112PB | $950.00 | $1,590.00 |
| 11'11" x 22" One World Wide 1PB | WOOW111119PB | $880.00 | $1,430.00 |
| 11'11" x 22" One World Wide 2PB | WOOW111129PB | $935.00 | $1,530.00 |
| 11'11" x 35' One World 1PB | WOOW11111PB | $880.00 | $1,430.00 |
| 11'11" x 36' One World 2PB | WOOW11112PB | $935.00 | $1,550.00 |



*Your Life, Your SUP™*
**2014 FOCUS SUP HAWAII DEALER PRICE LIST**

| STAND UP PADDLEBOARDS | | | | |
|---|---|---|---|---|
| MODEL | CONSTRUCTION | SKU | DEALER | MSRP |
| 10'10" SMOOTHIE | FME | 10'10" x 32" x 4-5/8" | FS3210DGP | $930.00 | $1,500.00 |
| | ACT | | FS1710105-ACT | $1,200.00 | $1,700.00 |
| 11'1" SMOOTHIE | FME | 11'1" x 32" x 4-3/8" | FS3211DGP | $935.00 | $1,500.00 |
| | ACT | | FS111146-ACT | $1,200.00 | $1,700.00 |

**BODY GLOVE**

*The Ultimate Watersports Brand™*
**2014 BODY GLOVE SUP PRICE LIST**

| STAND UP PADDLEBOARDS | | | |
|---|---|---|---|
| SUP SIZE | SKU | DEALER | MSRP |
| 9'10" Venture LWE | BG1491DGP | $730 | $1,115 |
| 10'10" Journey LWE | BG1410DGP | $765 | $1,175 |
| 11'10" Explorer DWE | BG1411DGP | $795 | $1,215 |



Stoked For Life ™

## 2014 Stand Up Paddle Sports Price List

| STAND UP PADDLEBOARDS | | | |
|---|---|---|---|
| **SUP MODEL°** | **SKU** | **DEALER** | **MSRP** |
| 11'11" x 31" One World Surfari 1PB | WDOW11111PB | $895.00 | $1,490.00 |
| 11'11" x 31" One World Surfari 2PB | WDOW11112PB | $950.00 | $1,590.00 |
| 11'1" x 32" One World Wide 1PB | WDOWW1111PB | $880.00 | $1,450.00 |
| 11'1"x 32" One World Wide 2PB | WDOWW1112PB | $935.00 | $1,550.00 |
| 11'1" x 30" One World 1PB | WDOW1111PB | $880.00 | $1,450.00 |
| 11'1" x 30" One World 2PB | WDOW1112PB | $935.00 | $1,550.00 |
| 10'3" x 33" Mahalo X-Wide 1PB | WDM103XW1PB | $870.00 | $1,450.00 |
| 10'3" x 33" Mahalo X-Wide 2PB | WDM103XW2PB | $925.00 | $1,550.00 |
| 10'3" x 31" Mahalo Wide 1PB | WDM103W1PB | $870.00 | $1,450.00 |
| 10'3" x 31" Mahalo Wide 2PB | WDM103W2PB | $925.00 | $1,550.00 |
| 10'3" x 29.5" Mahalo 1PB | WDM1031PB | $870.00 | $1,450.00 |
| 10'3" x 29.5" Mahalo 2PB | WDM1032PB | $925.00 | $1,550.00 |
| 9'6" x 32" Stoke Wide 1PB | WDS96W1PB | $850.00 | $1,425.00 |
| 9'6" x 32" Stoke Wide 2PB | WDS96W2PB | $910.00 | $1,525.00 |
| 9'6" x 30.5" Stoke 1PB | WDS961PB | $850.00 | $1,425.00 |
| 9'6" x 30.5" Stoke 2PB | WDS962PB | $910.00 | $1,525.00 |
| 9'2" x 32" WD Wide 1PB | WDWD92W1PB | $845.00 | $1,395.00 |
| 9'2" x 32" WD Wide 2PB | WDWD92W2PB | $880.00 | $1,475.00 |
| 8'10" x 32" WD Wide 1PB | WDWD810W1PB | $830.00 | $1,375.00 |
| 8'10" x 32" WD Wide 2PB | WDWD810W2PB | $880.00 | $1,475.00 |
| 8'6"  x 31" WD Wave 1PB | WDWD86W1PB | $830.00 | $1,375.00 |
| 8'6"  x 31" WD Wave 2PB | WDWD86W2PB | $880.00 | $1,475.00 |
| 8'4"x 30" WD Wave 1PB | WDWD841PB | $820.00 | $1,365.00 |
| 8'4"x 30" WD Wave 2PB | WDWD842PB | $875.00 | $1,450.00 |

°Colors Available: Blue, Aqua, Pink, Green, & Silver.  Please Indicate Desired Color When Ordering

°Price includes installed deck pad & fiberglass center fin

**Stand Up Paddle Sports** is produced and distributed under license by:

**Focus SUP Brands** · 12114 Sherman Way, North Hollywood, CA 91605

Tel# 1.818.765.4511  Fax# 1.818.759.4736

website: www.focussup.com   e-mail: info@focussup.com

**Stand Up Paddle Sports**                                    Stoked For Life ™

Santa Barbara, CA

Prices are FOB VA Port

| MODEL | SKU | FOB DISTRO | DEALER | DIFF (already without the $25) |
|---|---|---|---|---|
| 11'11" X 31 ONE WORLD 1PB | WDOW11111 | $743 | $855 | $87 |
| 11'11" X 31 ONE WORLD 2PB | WDOW11112 | $797 | $915 | $93 |
| 11'11" X 31 ONE WORLD 1PA | WDOW11111 | $743 | $855 | $87 |
| 11'11" X 31 ONE WORLD 2PA | WDOW11112 | $797 | $915 | $93 |
| 11'11 x 31" ONE WORLD CARBON | WDO41111CW | $960 | $1135 | $150 |
| 11'1" ONE WORLD 32" 1PB | WDOW1111P | $728 | $855 | $102 |
| 11'1" ONE WORLD 32" 2PB | WDOW1112P | $781 | $905 | $99 |
| 11'1" ONE WORLD 32" 1PA | WDOW111PA | $728 | $855 | $102 |
| 11'1" ONE WORLD 32" 2PA | WDOW1112P | $781 | $905 | $99 |
| 11'1" ONE WORLD 32" CARBON | WDOW111CW | $1025 | $1100 | $50 |
| 10'3" MAHALO (29.5") 1PB | WDM1031PB | $719 | $835 | $91 |
| 10'3" MAHALO (29.5") 2PB | WDM1032PB | $772 | $885 | $88 |
| 10'3" MAHALO (29.5") 1PA | WDM1031PA | $719 | $835 | $91 |
| 10'3" MAHALO (29.5") 2PA | WDM1032PA | $772 | $885 | $88 |
| 10'3" MAHALO (29.5") CARBON | WDM103CW | $985 | $1060 | $50 |
| 10'3" MAHALO WIDE (31") 1PB | WDM103W1P | $719 | $835 | $91 |
| 10'3" MAHALO WIDE (31") 2PB | WDM103W2P | $772 | $885 | $88 |
| 10'3" MAHALO WIDE (31") 1PA | WDM103W1P | $719 | $835 | $91 |
| 10'3" MAHALO WIDE (31") 2PA | WDM103W2P | $772 | $885 | $88 |
| 10'3" MAHALO WIDE (31") | WDM103WC | $985 | $1060 | $50 |
| 10'3" MAHALO X-WIDE (33") 1PB | WDM103XW1 | $719 | $835 | $91 |
| 10'3" MAHALO X-WIDE (33") 2PB | WDM103XW2 | $772 | $885 | $88 |
| 10'3" MAHALO X-WIDE (33") 1PA | WDM103XW1 | $719 | $835 | $91 |
| 10'3" MAHALO X-WIDE (33") 2PA | WDM103XW2 | $772 | $885 | $88 |
| 10'3" MAHALO X-WIDE (33") | WDM103XWC | $985 | $1060 | $50 |
| 9'6" STOKE 30.5" 1PB | WDS961PB | $701 | $815 | $89 |
| 9'6" STOKE 30.5" 2PB | WDS962PB | $754 | $865 | $86 |
| 9'6" STOKE 30.5" 1PS | WDS961PS | $701 | $815 | $89 |
| 9'6" STOKE 30.5" 2PS | WDS962PS | $754 | $865 | $86 |
| 9'6" STOKE 30.5" CARBON | WDS96SCW | $945 | $1020 | $50 |
| 9'6" STOKE WIDE 32" 1PB | WDS96W1PB | $701 | $815 | $89 |
| 9'6" STOKE WIDE 32" 2PB | WDS96W2PB | $754 | $865 | $86 |
| 9'6" STOKE WIDE 32" 1PS | WDS96W1PS | $701 | $815 | $89 |
| 9'6" STOKE WIDE 32" 2PS | WDS96W2PS | $754 | $865 | $86 |
| 9'6" STOKE WIDE 32" CARON | WDS96WCW | $945 | $1020 | $50 |
| 9'2" WD WIDE 32" 1PB | WDWD92W1P | $693 | $815 | $97 |
| 9'2" WD WIDE 32" 2PB | WDWD92W2P | $746 | $865 | $94 |



*Your Life, Your SUP™*

**2014 FOCUS SUP HAWAII DEALER PRICE LIST**

## STAND UP PADDLEBOARDS

### TORPEDO - PERFORMANCE SUP

| MODEL | CONSTRUCTION | SIZE | SKU | DEALER | MSRP | MAP |
|---|---|---|---|---|---|---|
| 7'4" TORPEDO | EWE | 7'4" x 29" x 4 1/4" | FS1274T | $830.00 | $1,185.00 | $1,275.00 |
| | ACT | | FS1374T-ACT | $945.00 | $1,350.00 | $1,455.00 |
| 8'2" TORPEDO | EWE | 8'2" x 30" x 4 1/4" | FS1282T | $840.00 | $1,200.00 | $1,290.00 |
| | ACT | | FS1382T-ACT | $985.00 | $1,405.00 | $1,515.00 |
| 8'9" TORPEDO | EWE | 8'9" x 32" x 4 1/2" | FS1289T | $840.00 | $1,200.00 | $1,290.00 |
| | ACT | | FS1389T-ACT | $1,010.00 | $1,445.00 | $1,555.00 |
| 8'10 TORPEDO | EWE | 8'10" x 29" x 4 1/8" | FS12810T | $850.00 | $1,215.00 | $1,310.00 |
| | ACT | | FS13810T-ACT | $1,010.00 | $1,445.00 | $1,555.00 |
| 9'3" TORPEDO | EWE | 9'3" x 29 1/2" x 4 1/8" | FS1293T | $860.00 | $1,230.00 | $1,325.00 |
| | ACT | | FS1393T-ACT | $1,080.00 | $1,545.00 | $1,660.00 |
| 9'6 TORPEDO | EWE | 9'6" x 31" x 4 1/4" | FS1296T | $870.00 | $1,245.00 | $1,340.00 |
| | ACT | | FS1396T-ACT | $1,080.00 | $1,545.00 | $1,660.00 |
| 10'2" TORPEDO | EWE | 10'2" x 34" x 4 1/2" | FS12102T | $885.00 | $1,265.00 | $1,360.00 |
| | ACT | | FS13102T-ACT | $1,145.00 | $1,635.00 | $1,760.00 |

### SMOOTHIE - ALL AROUND SUP

| MODEL | CONSTRUCTION | SIZE | SKU | DEALER | MSRP | MAP |
|---|---|---|---|---|---|---|
| 9'0" SMOOTHIE | EWE | 9'0" x 32" x 4" | FS1290SP | $870.00 | $1,245.00 | $1,340.00 |
| | ACT | | FS1390S-ACT | $970.00 | $1,385.00 | $1,490.00 |
| 9'6" SMOOTHIE | EWE | 9'6" x 31" x 4 1/2" | FS1296SP | $870.00 | $1,245.00 | $1,340.00 |
| | ACT | | FS1210SWP-ACT | $995.00 | $1,420.00 | $1,530.00 |
| 10'0" SMOOTHIE | EWE | 10'0" x 32" x 4 5/8" | FS1210SP | $895.00 | $1,280.00 | $1,375.00 |
| | ACT | | FS1310SP-ACT | $1,025.00 | $1,465.00 | $1,575.00 |
| 10'0" SMOOTHIE WIDE | EWE | 10'0" x 33" x 4 5/8" | FS12104SWP | $895.00 | $1,280.00 | $1,375.00 |
| | ACT | | FS1310SW-ACT | $1,025.00 | $1,465.00 | $1,575.00 |
| 10'4" SMOOTHIE | EWE | 10'4" x 32" x 4 5/8" | FS12104SP | $905.00 | $1,295.00 | $1,390.00 |
| | ACT | | FS13104S-ACT | $1,075.00 | $1,535.00 | $1,655.00 |
| 10'5" SMOOTHIE | EWE | 10'5" x 35" x 4 3/4" | FS12105SP | $905.00 | $1,295.00 | $1,390.00 |
| | ACT | | FS13105S-ACT | $1,085.00 | $1,550.00 | $1,670.00 |
| 10'10"SMOOTHIE | EWE | 10'10" x 32" x 4 5/8" | FS121010SP | $915.00 | $1,305.00 | $1,410.00 |
| | ACT | | FS131010S-ACT | $1,100.00 | $1,570.00 | $1,690.00 |
| 11'4" SMOOTHIE | EWE | 11'4" x 32" x 4 3/8" | FS12114SP | $925.00 | $1,320.00 | $1,425.00 |
| | ACT | | FS13114S-ACT | $1,135.00 | $1,620.00 | $1,745.00 |

### CLASSIC

| MODEL | CONSTRUCTION | SIZE | SKU | DEALER | MSRP | MAP |
|---|---|---|---|---|---|---|
| 9'0" CLASSIC | EWE | 9'0" x 28 3/4" x 3 7/8" | FS1290C | $875.00 | $1,250.00 | $1,345.00 |
| | ACT | | FS1390C-ACT | $970.00 | $1,385.00 | $1,490.00 |
| 10'0" CLASSIC | EWE | 10'0" x 30" x 4 1/8" | FS1210C | $895.00 | $1,280.00 | $1,375.00 |
| | ACT | | FS1310C-ACT | $1,040.00 | $1,485.00 | $1,600.00 |
| 10'4" CLASSIC | EWE | 10'4" x 30" x 4 1/8" | FS12104C | $905.00 | $1,295.00 | $1,390.00 |
| | ACT | | FS13104C-ACT | $1,065.00 | $1,520.00 | $1,640.00 |
| 10'10" CLASSIC | EWE | 10'10" x 30" x 4 3/8" | FS121010C | $915.00 | $1,305.00 | $1,410.00 |
| | ACT | | FS131010C-ACT | $1,100.00 | $1,570.00 | $1,690.00 |



*The Ultimate Watersports Brand™*

**2014 BODY GLOVE SUP PRICE LIST**

| STAND UP PADDLEBOARDS | | | |
|---|---|---|---|
| *SUP SIZE* | *SKU* | *DEALER* | *MSRP* |
| 9'10" Venture EWE | BG14910P | $730 | $1,115 |
| 10'10" Journey EWE | BG141010P | $765 | **$1,175** |
| 11'10" Explorer EWE | BG141110P | $795 | $1,215 |

| ACCESSORIES | | | |
|---|---|---|---|
| *ACCESSORIES* | *SKU* | *DEALER* | *MSRP* |
| Aluminum Adjustable Paddle | BGALUAS | $50 | **$95** |
| 9'10" Day Carrier Bag | BGDC910 | $50 | $95 |
| 10'10"Day Carrier Bag | BGDC1010 | $50 | $95 |
| 11'10" Day Carrier Bag | BGDC1110 | $50 | **$95** |
| 9' Leash | BGLSH9 | $18 | **$35** |

Body Glove SUP is produced and distributed under license by:

Focus SUP Brands - 12114 Sherman Way, North Hollywood, CA 91605

Tel# 1.818.765.4511  Fax# 1.818.759.4736

website: www.focussup.com   e-mail: info@focussup.com

**EXHIBIT "7"**

**EXHIBIT "7"**

**EXHIBIT "7"**

**EXHIBIT "7"**

**EXHIBIT "7"**

**EXHIBIT "7"**

**EXHIBIT "7"**





**EXHIBIT "8"**

**EXHIBIT "8"**

**EXHIBIT "8"**

**EXHIBIT "8"**

**EXHIBIT "8"**

**EXHIBIT "8"**

**EXHIBIT "8"**

## Clark Lammers

From:
Sent:
To:
Cc:
Subject:



**Jacob Ben Zvi**
Wednesday, July 08, 2015 6:23 PM

**wardog**
Wednesday, June 24, 2015 2:38 PM

Aloha Jacob,
Please see my responses below...

> **Jacob Ben Zvi**
> Tuesday, June 16, 2015 4:49 PM
>
> Hi guys, sorry for my very late reply.
>
> I'll address all things in your email and anything that came after wards in my reply today.
>
> Agreement>
> > 1. Yes the contract agreement did expire, sorry for my lack of appropriate words, I honestly didn't know how to best present it. Neither you or I discussed it and I was juggling this idea for few months before I emailed it to you. And new order was produced few months prior to our end of term. So I had boards made and shipped.

The truth is that you were the party responsible for proposing and initiating the contract agreement directed to us in the first place, so the responsibility to initiate a conversation about it's renewal, or lack of, was/is squarely yours...

In fact, you had several opportunities while you were "juggling this idea" in your head, from the Surf Expo show last September up until the end of December to open a discussion...especially, since it involved the production of our boards beyond the contract expiration...I have always been candid with open and honest communication with you...and, it's quite baffling and disappointing why it wasn't reciprocated....honesty and integrity are truly important to us...

1

2.    Attached is the list of all boards made this year and shipped.

Why was a 7'11" Hammer made and sold to Half Moon Bay Kayak?
Our contract specified Eastern Time Zone...this is a clear violation to make and sell one of our boards to your customer in Northern California and we don't get how this could have happened without our approval...

3.    Also attached are boards made but never shipped, still in the factory.

Why are we just now finding out about these?

4.    Attached list of boards currently in Los Angeles office
5.    I would like to offer you the Los Angeles ad China located boards to ship to you guys, I can offer deep discounts so it make it a great deal for you to own them.

Notes>

1.    I'll be happy to offset any money owned by us to you and by you to us with the boards we have in stock and in china, I think it makes best sense if we do that.

What exactly are you offering?
The boards in LA have the old style handles...and, aren't sizes, or colors, that we need...plus, we are producing them elsewhere...
You owe us a number of boards because of QA issues...it would be OK to subtract them from the boards already completed at the Aqua Surf factory...
I would hope that your "great deal deep discounts" reflect the fact that the boards were produced beyond the contract expiration for Red Dog and we also have factory pricing...
There also needs to be a provision to take care of future QA issues with those boards...

6.    I did remove any supsports logos and marketing info from our site.
Not before releasing a misleading Focus newsletter in March with it included...
Additionally, stickering over my One World design that Mo used at PRG 2015 and not giving me any credit whatsoever on your blog or social media shows a clear lack of humility and integrity...amongst other things...it sadly doesn't appear to be in line with your closing statement...

my time spending with you and Deb is cherished.

# "production board from Focus SUP"

Really?

Statement form Focus SUP>
    1.  We will adjust the 2 paddles and 2 deck pads in your statement. Can you tell the cost I need
       to credit you for?

Our cost on pads from you are $65ea.
The landed cost of the paddles is $115...total $360

    2.  I do need payment on the machine files, I never heard that they were not good until I
      emailed about the payment for them. It took a long time to advise me on the fact that they
      are not good, and in the meanwhile you have produced many of those models in the USA which
      led me to understand that there was nothing wrong with them.

That is simply not true...I sent you guys my board files when you asked for them awhile ago...and, ALL
of the boards that we produce are from files of the scans that we have paid for...
I didn't ask for you to scan my boards in China...you initiated that to help facilitate your production...I
only asked for them because I wanted to look over them for QA and compare them to the previous set
that I gave to you...and, I said that in an email to you...

I didn't get to compare them until after Surf Expo because I was working feverishly in the weeks leading
up to Surf Expo to get my new website up...
Regardless, I have told you on several occasions that the noses on my boards were way off...then, the
tails were off...etc...you even took a number of pics to document it for yourself...

Sorry, the scans don't match my boards...they are all way off...
I'm talking location of the wide points...max thickness location...nose
rockers...tail rockers...etc...on all of them...garbage in = garbage out...
Never used them and won't...it all boils down to the quality of the
scans...all of the boards in California that I've made, and continue to
make, are from my original scans and converted files...

    3.  Same with the decals, we have shipped them the order of decals and I see them used pun
      the boards made locally and until the point that I asked for payment I was never advised before
      that there was any problem with them.

All of the decals that I have been using on our domestic boards, I had produced in China myself and
shipped over with our boards, fins, and paddles...
Again, the issue here is that you stopped communicating with us...so, there wasn't an opportunity bring
up the quality issues...you avoided talking about things like this because you didn't want to discuss the
contract agreement...months and months went by without discussion...silence was deafening...

Regardless, some of them were used...the bad ones cost us days of critical production time...so, let's split
the cost...charge us for 1/2 of them...

Sales reports>
    1.  I will have a sales report of all WD boards made by Focus SUP. I asked my accountant to
      provide that.

    2.   We don't have the serial on this report, we never included the board serial number on any
of our sales so we can't track that.

Aqua Surf obviously has a list...how else can they put them on our boards...and, why else do you ask for
serial numbers with board QA issues?


    QA>

        1.   I don't think I ever got a reply to my email with what model it was and specs that I needed
to make a new one with the wrong handle position board. I can still cover that now but not in a
new production, but with one of the existing boards I have in stock. See attached lists.

You picked the board up and I thought you took pics of it next to one with the handle in the right
place...it was a CG/CW 8'11" WD serial #1704...

We also had a CA/CW 10'6" Hammer buckle on our client who is an ER doc in Oregon the 2nd time he
used it...serial number #1851...pics attached...



    Notes>

        1.   I'll be happy to offset any money owned by us to you and by you to us with the boards we
have in stock and in china, I think it makes best sense if we do that.

Let me know what you think please,  my time spending with you and Deb is cherished.



Jacob, both Deb and I have had some enjoyable times...of course, we would have liked for things to
have turned out better...and, we feel that we made a number of concessions to remove any roadblocks to
facilitate that...regardless, neither of us want to see those times blemished by these issues we have here
that can, and should, get resolved fairly and transparently...

Please generate an account statement that reflects our owed royalties along with accounting related
comments above factored in and we will consider it...

--

Mahalos , good waves, & strong strokes...{:~)

Warren (WARDOG ®) Thomas
President/CEO SurfingSports® .com, Inc. & Standup Paddle Sports® , LLC

(805)962-SUPS (7877) store
(480)772-4031 fax
(888)805-9978 toll free

Retail Store:
Standup Paddle Sports® , LLC
121 Santa Barbara St.
Santa Barbara,Ca. 93101

Admin Mailing/Billing:
surfingsports.com, Inc.
3905 State St. Suite 7-315
Santa Barbara,Ca. 93105

supsports.com
surfingsports.com
Stoked For Life ®
SUPsports ®

-  Join us on Facebook
- Follow us on Instagram
- Follow us on Twitter
- Watch us on YouTube
- Pin us on Pinterest
- Review us on Yelp

http://paddlesurfing.com
http://standuppaddlesurf.com
http://standuppaddlesports.com
http://beachboysurfing.com
http://standuppaddlesurfer.com
http://standuppaddlesurfing.com
http://standuppaddleboards.com
http://standuppaddlling.com
http://supsurfing.com
http://supboards.com

**EXHIBIT "9"**

**EXHIBIT "9"**

**EXHIBIT "9"**

**EXHIBIT "9"**

**EXHIBIT "9"**

**EXHIBIT "9"**

**EXHIBIT "9"**

**Clark Lammers**

From:
Sent:
To:
Cc:
Subject:

-------- Original Message --------
Subject: RE: OI-2075 - Stand Up Paddle
Date: Wed, 8 Jul 2015 18:23:56 -0700
From: Jacob Ben Zvi <jacob@focussup.com>
To: wardog <wardog@surfingsports.com>
CC: Debra Keys-Thomas <deb@surfingsports.com>

Warren, I'm back and here are the answers to your comments.
Â
Â
Â
Â
Respectfully yours,
Â
Jacob Benzvi
co-Founder & President
**Focus SUP Hawaii**
"Your Life Your SUP" TM
Â
www.focussup.com
Like us on FACEBOOK
Follow Us on twitterÂ
Â
Â
Our fastest boards ever now available for the 2015 race season!
2015 Bluefin SUP Race Line
Â
Â

**From:** wardog [mailto:wardog@surfingsports.com]
**Sent:** Wednesday, June 24, 2015 2:38 PM
**To:** Jacob Ben Zvi
**Cc:** Debra Keys-Thomas
**Subject:** Re: OI-2075 - Stand Up Paddle
Â
Aloha Jacob,
Please see my responses below...

Jacob Ben Zvi

1

Tuesday, June 16, 2015 4:49 PM

Hi guys, sorry for my very late reply.
Â
I'llÂ address all things in yourÂ email and anything that came after wards in my reply today.
Â
Agreement>

> 1.Â Â Â Â Â Â Yes the contract agreement did expire, sorry for my lack of appropriate words, IÂ honestly didn't know how to best present it. Neither you or I discussed it and I was juggling this idea for few months before I emailed it to you. And new order was produced few months prior to our end of term. So I had boards made and shipped.

The truth is that you were the party responsible for proposing and initiating the contract agreement directed to us in the first place, so the responsibility to initiate a conversation about it's renewal, or lack of,Â was/is squarely yours...

In fact, you had several opportunities while you were "juggling this idea" in your head,Â from the Surf Expo show last September up until the end of December to open a discussion...especially, since it involved the production of our boards beyond the contract expiration...I have always been candid with open and honest communication with you...and, it's quite baffling and disappointing why it wasn't reciprocated....honesty and integrity are truly important to us...

I juggled the idea for months because we havenâ€™t seen any sales in our distribution side, and since your orders from me became fewer and fewer I didnâ€™t see any upside business wise to continue the distribution. Paying you such a high rate of royalties needs to make sense from all sides of the business relations, both distribution and orders.
Â

> 2.Â Â Â Â Â Â Attached is the list of all boards made this year and shipped.

Why was a 7'11" Hammer made and sold to Half Moon Bay Kayak?
Our contract specified Eastern Time Zone...this is a clear violation to make and sell one of our boards to your customer in Northern California and we don't get how this could have happened without our approval...

Not sure why and how it was sold.

> 3.Â Â Â Â Â Â Also attached are boards made but never shipped, still in the factory.

Why are we just now finding out about these?
Â
Its Pat of the boards that I already told you were produced in late 2014, but RDA do not want them. So they are available Â for you, I actually checked all of them in the factory and all are very good and strong.

> 4.Â Â Â Â Â Â Attached list of boards currently in Los Angeles office
> 5.Â Â Â Â Â Â I would like to offer you the Los Angeles ad China located boards to ship to you guys, I can offer deep discounts so it make it a great deal for you to own them.

Notes>

1.Â Â Â Â Â Â I'llÂ be happy to offset any money owned by us to you and by you to us with the boards we have in stock and in china, I think it makes best sense if we do that.Â

2

Â
What exactly are you offering?
The boards in LA have the old style handles...and, aren't sizes, or colors, that we need...plus, we are producing them elsewhere...
Â
Donâ€™t worry about those boards, yes they are Â very old boards that we could never sell.

You owe us a number of boards because of QA issues...it would be OK to subtract them from the boards already completed at the Aqua Surf factory...
Â
Send me an excel list of all boards you need QA on

I would hope that your "great deal deep discounts" reflect the fact that the boards were produced beyond the contract expiration for Red Dog
RDA refuses to take them, so they were not SOLD to anyone yet. Still in the factory.
Â
and we also have factory pricing...
my prices will be discounted by 25% from your old prices, doesn't matter if you have factory prices, you had factory prices ever since the first SUP was produced in Chinaâ€¦

There also needs to be a provision to take care of future QA issues with those boards...
Send me the list so we can factor that in


          6.Â Â Â Â Â Â I did remove any supsports logos and marketing info from our site.
Not before releasing a misleading Focus newsletter in March with it included...
Thanks for bringing this to my attention
Â

Additionally, stickering over my One World design that Mo used at PRG 2015 and not giving me any credit whatsoever on your blog or social media shows a clear lack of humility and integrity...amongst other things...it sadly doesn't appear to be in line with your closing statement...
those words are not mine, we used text from the event, and stickering them up was all done by Mo and Tony on site, I wasnâ€™t there.

# "production board from Focus SUP"

Really?

Â
Statement form Focus SUP>
          1.Â Â Â Â Â Â We will adjust the 2 paddles and 2 deck pads in your statement. Can you tell the cost I need
          to credit you for?
Our cost on pads from you are $65ea.
The landed cost of the paddles is $115...total $360

3

tomorrow we will send the adjusted statement.
Â

> 2.Â Â Â Â Â Â I do need payment on the machine files, I never heard that they were not good until I
> emailed about the payment for them. It took a long time to advise me on the fact that they areÂ not
> good, and in the meanwhile you have produced many of those models in the USA which led me to
> understand that there was nothing wrong with them.

That is simply not true...I sent you guys my board files when you asked for them awhile ago...and, ALL of the
boards that we produce are from files of the scans that we have paid for...
I didn't ask for you to scan my boards in China...you initiatedÂ that to help facilitate your production...I only
asked for them because I wanted to look over them for QA and compare them to the previous set that I gave to
you...and, I said that in an email to you...

I didn't get to compare them until after Surf Expo because I was working feverishly in the weeks leading up to
Surf Expo to get my new website up...
Regardless, I have told you on several occasions that the noses on my boards were way off...then, the tails were
off...etc...you even took a number of pics to document it for yourself...

```
Sorry, the scans don't match my boards...they are all way off...
I'm talking location of the wide points...max thickness location...nose
rockers...tail rockers...etc...on all of them...garbage in = garbage out...
Never used them and won't...it all boils down to the quality of the
scans...all of the boards in California that I've made, and continue to
make, are from my original scans and converted files...
```
Â
if you really want to know than that was a strong reason for me to stop working together, because I was waiting
for this payment for months and it never came, and even when I asked for it I got the door closed in my face.
We sat in your office and you told me the exact models you wanted me to scan. We used the files for OUR
production of your boards, not for you to use them yourself without paying for them.
It cost us money to scan them and then make the changed of the file with Marie. It was done for you, and if it
was for QC purposes there are many ways to check, including PDF files of each part of the board.
Fact is, I scanned and converted boards files for your own USA / China based production and was never paid.
Â
Â
Â
Â

> 3.Â Â Â Â Â Â Same with the decals, we have shipped them the order of decals and I see them used pun
> the boards made locally and until the point that I asked for payment I was never advised before that
> there was any problem with them.

All of the decals that I have been using on our domestic boards, I had produced in China myself and shipped
over with our boards, fins, and paddles...
Again, the issue here is that you stopped communicating with us...so, there wasn't an opportunity bring up the
quality issues...you avoided talking about things like this because you didn't want to discuss the contract
agreement...months and months went by without discussion...silence was deafening...

Regardless, some of them were used...the bad ones cost us days of critical production time...so, let's split the cost...charge us for 1/2 of them...

Sorry I can't split the cost because I paid for it in full, and was never told anything about it until I asked for payment. Even when we send the invoice to you, you never mentioned I think anything, only when we sent the stamen and asked for payment it came to light that you have issues with it.
Â
Â
   Â
   Sales reports>
       1.Â Â Â Â Â Â I will have a sales report of allÂ WD boards made by Focus SUP. I asked my accountant to provide that.
       2.Â Â Â Â Â Â We donâ€™t have the serial on this report, we never included the board serial number on any of our sales so we can't track that.
Aqua Surf obviously has a list...how else can they put them on our boards...and, why else do you ask for serial numbers with board QA issues?
Â
They donâ€™t keep board numbers on any paperwork that I know, they have sheets of numbers laminates they apply to the boards. But I'll Â double check with them.
Â


   Â
   QA>
       1.Â Â Â Â Â Â Â I donâ€™t think I ever got a reply to my email with what model it was and specs that I needed to make a new one with the wrong handle position board. I can still cover that now but not in a new production, but with one of the existing boards I have in stock. See attached lists.
You picked the board up and I thought you took pics of it next to one with the handle in the right place...it was a CG/CW 8'11" WD serial #1704...

Send the list I'll Â take care of what I can.

We also had a CA/CW 10'6" Hammer buckle on our client who is an ER doc in Oregon the 2nd time he used it...serial number #1851...pics attached...

Send the list I'll Â take care of what I can.
Â
   Â
   Notes>
       1.Â Â Â Â Â Â Â I'llÂ be happy to offset any money owned by us to you and by you to us with the boards we have in stock and in china, I think it makes best sense if we do that.
Let me know what you think please,Â my time spending with you and Deb is cherished.Â


Jacob, both Deb and I have had some enjoyable times...of course, we would have liked for things to have turned out better...and, we feel that we made a number of concessions to remove any roadblocks to facilitate that...regardless, neither of us want to see those times blemished by these issues we have here that can, and should, get resolved fairly and transparently...

It really bothers me that all of your emails hinting on one-side blame, Jacob side. I think we for sure do not need any blame game, but to move on and be happy. But I hope you realize it wasnâ€™t all on me as you put it.

Â

And in your first part of the email you wrote the word, honesty. Very big word and I strongly believe that I'm an honest guy, maybe not perfect and make mistakes but for sure honest.

Â

The issue with the files that I gave you to make USA boards and not being paid for them until today, is what really threw me off. Sorry.

Â


Please generate an account statement that reflects our owed royalties along with accounting related comments above factored in and we will consider it...

Â

I will send an account statement for all that we owe you and you owe us.

Â

Â

Â

--
Mahalos , good waves, & strong strokes...{:~)

Warren (WARDOG Â®) Thomas
President/CEO SurfingSportsÂ® .com, Inc. & Standup Paddle SportsÂ® , LLC

(805)962-SUPS (7877) store
(480)772-4031 fax
(888)805-9978 toll free

Retail Store:
Standup Paddle SportsÂ® , LLC
121 Santa Barbara St.
Santa Barbara,Ca. 93101

Admin Mailing/Billing:
surfingsports.com, Inc.
3905 State St. Suite 7-315
Santa Barbara,Ca. 93105

supsports.com
surfingsports.com
Stoked For Life Â®
SUPsports Â®

- Join us on Facebook
- Follow us on Instagram
- Follow us on Twitter
- Watch us on YouTube
- Pin us on Pinterest
- Review us on Yelp

http://paddlesurfing.com
http://standuppaddlesurf.com
http://standuppaddlesports.com
http://beachboysurfing.com
http://standuppaddlesurfer.com
http://standuppaddlesurfing.com
http://standuppaddleboards.com
http://standuppaddling.com
http://supsurfing.com
http://supboards.com

 

Â

Â
Â
Â
Â

        Â

Â
Â
Â
Â
Respectfully yours,
Â
Jacob Benzvi
co-Founder & President
**Focus SUP Hawaii**
"Your Life Your SUP" TM

7

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "10"**

**EXHIBIT "11"**

**EXHIBIT "11"**

**EXHIBIT "11"**

**EXHIBIT "11"**

**EXHIBIT "11"**

**EXHIBIT "11"**



**EXHIBIT "12"**

**EXHIBIT "12"**

**EXHIBIT "12"**

**EXHIBIT "12"**

**EXHIBIT "12"**

**EXHIBIT "12"**

Main     About Us     Brands     Dealer Locator

## Our Story



Growing up on the shores of the Mediterranean, the founders of Focus SUP Brands have been surfing since the age of 14 so this passion for surfing is embedded in their genes.

After founding their own brand in 2008, Focus SUP Hawaii, they decided to expand their Standup Paddleboard offerings by entering into a licensing agreement with the best shapers and designers the SUP industry has to offer anywhere in the world.

With our partners Body Glove, renowned Hawaiian shaper Pat Rawson, SUP pioneer Warren "Wardog" Thomas, and surf industry legends Izzy and Coco Tihanyi (who are also the founders of Surf Diva), we have developed the most complete line of Standup Paddleboards offered by any one company in the industry

Today, Focus SUP offers a full range of products for any SUP activity imaginable. This range includes over 60 models using three different construction technologies, including our proprietary and most successful ACT Carbon Technology

Focus SUP Brands products are distributed worldwide by our own subsidiaries and an exclusive independent distribution network

Return to top of page                                        Copyright © 2015  Genesis Framework   WordPress   Log in

**EXHIBIT "13"**

**EXHIBIT "13"**

**EXHIBIT "13"**

**EXHIBIT "13"**

**EXHIBIT "13"**

**EXHIBIT "13"**



**EXHIBIT "14"**

**EXHIBIT "14"**

**EXHIBIT "14"**

**EXHIBIT "14"**

**EXHIBIT "14"**

**EXHIBIT "14"**

http://www.standupzone.com/forum/index.php/topic,27469.0.html

SurfingSports®.com, Inc.

(805)962-SUPS (7877) store
(888)805-9978 toll free

Retail Store:
Standup Paddle Sports, LLC
121 Santa Barbara St.
Santa Barbara, CA 93101

**capobeachboy**
Peahi Status

Posts: 682

### Re: Payette River Games
« Reply #8 on: June 22, 2015, 05:04:42 PM »

Congrats Wardog !  I noticed the deckpad in some shots but he had the Focus logos all over so I wasn't sure.  That is very cool. Mo is just an amazing paddler and surfer.

👍 Logged

ambassador/team rider
KeNalu Paddles

**PT Woody**
Peahi Status

Posts: 597


### Re: Payette River Games
« Reply #9 on: June 24, 2015, 03:04:06 AM »

Quote from: SUPsports on June 22, 2015, 12:57:06 PM

> Mo Freitas won both the Cross and the SUPer G on our production 11'1" x 32" One World Wide...to take the first place and a $10,000 check... against a very talented field on the latest inflatable technology river and race boards...and, all of the other hard boards for that matter...
>
> http://supsports.com/standup-paddle-boards /one-world-series/

Payette River Games rules were 11' maximum. Did you shave an inch off the One World?

👍 Logged

**SUPsports**
Cortez Bank Status



### Re: Payette River Games
« Reply #10 on: June 24, 2015, 07:44:20 AM »

Thanks Chris...yeah, pretty stickered up...the board looked like a NASCAR entry...;-)